UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES BAIRD, et al., | Case No. 17-cv-01892-HSG (KAW) |
| Plaintiffs, | |
| v. | **ORDER REGARDING JOINT DISCOVERY LETTERS** |
| BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A., et al., | Re: Dkt. Nos. 114-117, 119 |
| Defendants. | |

On April 5, 2017, Plaintiffs filed the instant putative class action against Defendants, alleging violations of the Employee Retirement Income Security Act's ("ERISA") fiduciary duty and prohibited transactions provisions. (Compl. ¶ 1, Dkt. No. 1.) The parties filed four joint discovery letters on June 7, 2018, and a fifth joint discovery letter on June 8, 2018. (Dkt. Nos. 114-117, 119.) On July 19, 2018, the Court held a discovery hearing on two of the letters.

## I. BACKGROUND

Plaintiffs bring this case on behalf of two classes: the "BlackRock Plan Class," which consists of participants and beneficiaries in the BlackRock Retirement Savings Plan, and the "CTI Class," which includes participants whose individual accounts were invested in BlackRock proprietary collective trust investment funds ("CTIs"). (First Amended Compl. ¶ 1 ("FAC"), Dkt. No. 75.) Plaintiffs allege that Defendants violated their fiduciary duties under ERISA in two ways. (FAC ¶ 3.) First, Plaintiffs allege that Defendant BlackRock sponsored a 401(k) plan for its employees, in which Defendant "BlackRock offers an investment menu consisting almost entirely of BlackRock proprietary funds, and charges participants excessive, hidden fees, expenses and other compensation paid to BlackRock and its affiliates, through a layered fund structure." (FAC ¶ 5.) Second, Plaintiffs allege that Defendant BlackRock Institutional Trust Co. ("BTC"),

1 which provides management services, gave itself and its affiliates preferential treatment as to
2 compensation paid by the BlackRock CTIs. (FAC ¶¶ 6, 23.) This alleged preferential treatment
3 included paying itself excessive fees for securities lending services. (FAC ¶ 6.)

## II. LEGAL STANDARD

Under Rule 26, in a civil action, a party may obtain discovery "regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Additionally, the court must limit the frequency or extent of discovery if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

## III. DISCUSSION

### A. Joint Discovery Letter No. 1 (Dkt. No. 114)

Joint Discovery Letter No. 1 concerns Plaintiff's Request for Production No. 33, which seeks documentation and communications concerning changes to revenue sharing splits between Defendant BlackRock and investors in iShares[1] ETFs and mutual funds for securities lending revenue. (Dkt. No. 114 at 1.) These ETFs and mutual funds are not at issue in the case.

Securities lending revenue is generated when a fund lends securities that it owns to a borrower in exchange for collateral, which is reinvested to generate additional revenue for the fund. (*Id.*) Plaintiffs assert that Defendant BTC charges the BlackRock CTIs a fee of 50% of this revenue for its securities lending services. (*Id.* at 2; FAC ¶ 256.) Plaintiffs allege that this 50% fee is excessive because Defendant BTC charges investors in similar BlackRock ETFs and mutual

---

[1] iShares are managed by BlackRock.

2

funds a fee of 15-30% for the same services. (Dkt. No. 114 at 2; FAC ¶¶ 259-60.) Plaintiffs further allege that Defendant BTC receives less compensation for its securities lending services to these other BlackRock ETFs and mutual funds because those fund investors are represented by independent fiduciaries, whereas Defendant BTC is the sole fiduciary representing the BlackRock CTIs investors. (Dkt. No. 114 at 2; FAC ¶¶ 257-58.) To this end, Plaintiffs seek the requested documents to determine how and why the securities lending fees for the mutual funds and ETFs were reduced when the fees paid by the BlackRock CTIs remained at 50%. (Dkt. No. 114 at 4.)

Defendants argue that the discovery is not relevant because the CTIs are different from the mutual funds and ETFs, such that the fees charged are not comparable. (Dkt. No. 114 at 4.) Defendants primarily argue that the CTIs "consist[] of an integrated offering of investment management and securities lending, in exchange for an integrated or 'bundled' set of fees," in contrast to the mutual funds and ETFs, for whom the securities lending services "have been negotiated a la carte . . . ." (*Id.* at 4-5.) Defendants also point to structural differences, including "distinct services arrangements, compensation arrangements, reporting requirements, lending strategies, and management style," as well as "a distinct regulatory framework." (*Id.*)

The Court disagrees. First, the Court finds that it does not appear the 50% securities lending fee was a "bundled set of fees" that included both securities lending and investment management services. In Defendants' motion to dismiss, Defendants' argument was based on the CTIs paying a securities lending fee that was separate from investment management fees, stating: "[t]he Plan's payment of *only securities lending compensation*, *with no investment management fees*, is self-evidently reasonable." (Dkt. No. 79 at 21 (emphasis added).) Defendants also filed a declaration by Mr. Matthew Soifer, who oversees the negotiation of agreements by which sponsors of large plans invest in collective trust funds, stating: "Almost all of the [sponsors] that invest in the Lending [collective trust funds] invest pursuant to an agreement which provides that BTC shall receive *both* an investment management fee *and* 50% of securities lending income associated with the investment." (Dkt. No. 79-19 ¶ 5 (emphasis added).) Likewise, the "16

3

Things You Should Know" document[2] explains that the income earned from securities lending transactions are divided equally between Defendant BTC and the CTIs, and that "[t]he income divided is *net* of cash collateral management fees and the accrued borrower rebate fees." (Dkt. No. 125, Exh. 3 at BAIRD_046154.) All of this demonstrates that, contrary to Defendants' claim, the CTIs do not pay a single integrated fee for investment management and securities lending services, and that the 50% securities lending fee is for the securities lending service only. This was confirmed at the hearing, in which Defendants primarily argued that there was an integrated offering of the services, but that the amount of the securities lending fee itself was 50%.

Second, with respect to the argument about structural differences between the CTIs and the mutual funds and ETFs, Defendants fail to adequately explain why these structural differences would result in a difference between the amounts charged for the same securities lending services. Although Defendants point to *White v. Chevron Corp.*, Case No. 16-cv-793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016), the Court finds this case distinguishable. There, the plaintiffs alleged that the fiduciaries offered mutual funds with fees that could have been reduced by using alternative investments like collective trusts. 2016 WL 4502808, at *8. The district court rejected this claim, explaining that these different investment vehicles could not be compared solely by cost because they had different essential features, including regulatory and transparency features. *Id.* at *12. In other words, while it was true that the fiduciaries could have offered collective trusts with lower management fees, this would have been at the expense of other substantive features that warranted the higher fees. Here, in contrast, Defendants do not identify any structural difference that would warrant the CTIs charging a higher securities lending fee than the mutual funds and ETFs.

---

[2] The "16 Things You Should Know" document was provided in response to the Court's request for additional documents, despite the Court not requesting the document. (*See* Dkt. No. 124 at 1; Dkt. No. 125.) The Court had only requested BAIRD 429-436 and excerpts of the STIF Guidelines related to Discovery Letter No. 5. (Dkt. No. 124 at 1.) Plaintiffs request that the Court not consider these documents. (Dkt. No. 126.) The Court agrees that submission of the documents not requested by the Court was inappropriate, and that the Court would be within its authority not to consider these improper submissions. Nevertheless, the Court has reviewed the documents, and will cite to them accordingly. In the future, however, the Court will not consider **any** documents that are not properly before it.

4

*Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 931 F. Supp. 2d 296 (D. Mass. 2013), is instructive. There, the plaintiff asserted that the defendants breached their fiduciary duty when it appointed itself as a lending agent and set its securities lending fee at 50%. *Id.* at 302. The plaintiff argued that damages should be measured as the difference between the 50% securities lending fee charged by the defendant to the plaintiff, and the securities lending fee charged by the defendant to other clients during the same period. *Id.* at 307. The plaintiff argued that the defendants' other clients were comparable because "the fees [the defendant] charged these other clients were for the same service (securities lending) from the same service provider . . . during the same service time period . . . as the 50% fee at issue in this case." *Id.* The plaintiff also argued that the only significant distinguishing factor was how the fees were negotiated. *Id.* The district court ultimately agreed that the other clients could provide a proper point of comparison.[3]

The Court finds that the fees charged by the CTIs are comparable to those charged by the mutual funds and ETFs, making the discovery sought relevant. Here, as in *Glass Dimensions*, Plaintiffs seek to compare the fees charged by the CTIs with the fees charged by the mutual funds and ETFs for the same securities lending service, which was provided by the same agent, Defendant BTC. (Dkt. No. 114 at 3.) Moreover, Plaintiffs assert -- and Defendants do not dispute -- "that the same group of BlackRock employees provide [sic] lending services to all BlackRock clients whether the client fund is a CTI, a mutual fund, or an ETF," further highlighting the similarities between the services being provided. (*Id.*) Also, like *Glass Dimensions*, Plaintiffs here assert that the reason for the difference in the fees charged is because of how the fees were negotiated, as Plaintiffs believe the CTIs were represented by a conflicted fiduciary (Defendant BTC) while the ETFs and mutual funds were represented by a board consisting of a majority of disinterested trustees. (*Id.* at 1.)

In the alternative, Defendants argue that there is no need for discovery because Plaintiffs could simply argue that the excessive compensation was the result of Defendant BTC's conflicted

---

[3] Defendants argue that *Glass Dimensions, Inc.* is not applicable because it concerned damages. (Dkt. No. 114 at 5 fn.4.) While true, this does not change that the court had to first find that the fees charged to the plaintiff and the fees charged to the other clients was comparable in the first place.

5

process. (Dkt. No. 114 at 4.) The Court disagrees. Plaintiffs would still need to prove that the difference was because of the conflict, as opposed to some other unrelated reason; for example, Defendants argue that the ETFs have greater bargaining power, which could account for the differences. (*See id.* at 5.) Therefore, the Court finds that documents sought by Request for Production No. 33 are relevant to Plaintiffs' claims.

At the hearing, however, the Court explained that while Plaintiffs were entitled to the discovery sought, there were concerns regarding the breadth of the discovery requests. The Court therefore orders the parties to engage in further meet and confer, so that Plaintiffs can more clearly define what documents they really want from the request, taking into account proportionality and burden.

**B.     Joint Discovery Letter No. 2 (Dkt. No. 115)**

Joint Discovery Letter No. 2 concerns Plaintiff's Request for Production No. 34, which seeks documents concerning the gross and net profits that Defendant BlackRock and its affiliates earn from providing securities lending services to the BlackRock CTIs. (Dkt. No. 115 at 1.) Plaintiffs assert that this goes to whether the fees charged for the securities lending fees are reasonable. (*Id.* at 2.) Whether the fees are reasonable, in turn, goes to Defendants' argument in their motion to dismiss that the securities lending fee is permitted because it is reasonable compensation under § 408(b)(8). (Dkt. No. 79 at 20-21.)

Defendants argue that whether a fee is reasonable is not dependent on the cost of providing the service, but "focuses on whether the market is working. Where independent plan fiduciaries have agreed to a fee structure in the context of a competitive market for the services at issue, the court's inquiry is at [an] end." (Dkt. No. 115 at 4.) Defendants rely on the Best Interest Contract Exemption, which states:

> The reasonableness of the fees depends on the particular facts and circumstances at the time of the recommendation. Several factors inform whether compensation is reasonable including, *inter alia*, the market pricing of service(s) provided and the underlying asset(s), the scope of monitoring, and the complexity of the product. No single factor is dispositive in determining whether the charges are reasonable in relation to what the investor receives.

Best Interest Contract Exemption, 81 Fed. Reg. 21,002, 21,031 (Apr. 8, 2016). Defendants argue

that this Exemption does not list profitability. (Dkt. No. 115 at 4.) Defendants also argue that in considering what "reasonable compensation" for a fiduciary is, the Court need only consider "such amount as would ordinarily be paid for like services by like enterprises under like circumstances," relying on 26 C.F.R. § 2550.408c-2. (*Id.*)

The Court disagrees with Defendants' assertion that the cost of the service is not relevant to whether compensation is reasonable. Courts have explicitly found that the cost of a service can be a factor in determining whether a fee is reasonable. The Second Circuit has looked to the profitability of the fund to the adviser-manager in determining whether compensation is reasonable or in violation of a fiduciary duty. *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (articulating six-factor test for determining if a fee is so disproportionately large that it bears no reasonable relationship to the services rendered, including "the profitability of the fund to the adviser-manager"); *Young v. GM Inv. Mgmt. Corp.*, 325 Fed. Appx. 31, 33 (2d Cir. 2009) (citing to *Krinsk*'s six-factor test to determining whether excessive fees violated ERISA). Other courts have also found that reasonable compensation depends on the costs of the service in determining "reasonable compensation" under § 408(b)(2), which concerns contracting or making reasonable arrangements with a party in interest for services necessary for the establishment or operation of a plan.[4] *See Solis v. Current Dev. Corp.*, 557 F.3d 772, 779 (7th Cir. 2009) ("The statute requires that the services . . . cost no more than what's reasonable"); *Chao v. Malkani*, 216 F. Supp. 2d 505, 515 (D. Md. 2002) ("without any evidence of the services actually provided, or of the actual cost of those services, the defendants cannot show that the compensation requested was 'reasonable'"); *Engelhart v. CONRAIL*, Civil Action No. 92-7056, 1996 WL 526726, at *12 (E.D. Penn. Sept. 18, 1996) (in finding that the transaction satisfied § 408(b), noting that the plaintiff "does not challenge the reasonableness of the costs associated with

---

[4] Although these cases interpret § 408(b)(2), whereas the instant case concerns § 408(b)(8)(B), both subsections use the term "reasonable compensation." "The normal rule of statutory construction" is "that identical words used in different parts of the same act are intended to have the same meaning," and there is nothing in the statute to suggest that Congress intended for this term to have a different meaning between subsections. *Dep't of Revenue v. ACF Indus.*, 510 U.S. 332, 342 (1994) (internal quotations omitted).

7

services provided by the Company" and "has offered no evidence which would suggest a genuine issue of material fact as to these matters").

Neither the Best Interest Contract Exemption nor 26 C.F.R. § 2550.408c-2 assist Defendants here. While the Best Interest Contract Exemption does not list profitability as a factor in determining whether the fees are reasonable, the factors listed are not exclusive. *See* 81 Fed. Reg. 21,002, 21,031 ("Several factors inform whether compensation is reasonable *including* . . . .") (emphasis added). 26 C.F.R. § 255.408c-2(5), in turn, states that "any compensation which would be considered excessive under 26 CFR 1.162-7 . . . will not be 'reasonable compensation.'" 26 C.F.R. 1.162-7 states that "[i]t is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." 26 C.F.R. § 255.408c-2(5), however, goes on to say that "compensation which is not excessive under 26 CFR 1.162-7 may, nevertheless, *not be* 'reasonable compensation' . . . ." Thus, 29 C.F.R. § 255.408c-2(5) explicitly acknowledges that compensation that would ordinarily be paid for like services could still be unreasonable.

The Court therefore finds that information regarding the cost of the securities lending services provided by BTC is relevant to whether the fees are reasonable. To the extent Defendants assert that they do not perform a profitability analysis and that calculations of gross and net profits do not exist, Defendants are not required to create or produce documents that do not already exist. (Dkt. No. 115 at 5.) Defendants are, however, required to produce the information that does exist.

**C.     Joint Discovery Letter No. 3 (Dkt. No. 116)**

Joint Discovery Letter No. 3 concerns Defendants' privilege log. The parties dispute whether certain entries should have been produced per the fiduciary exception to attorney-client privilege. (Dkt. No. 116 at 1.) "As applied in the ERISA context, the fiduciary exception provides that an employer acting in the capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan beneficiaries on matters of plan administration." *United States v. Mett*, 178 F.3d 1058, 1063 (9th Cir. 1999). The Ninth Circuit has found, however, that "the fiduciary exception has its limits." *Id.* at 1063. "[W]hile the fiduciary exception does apply to advice on matters of plan administration, the attorney-client privilege reasserts itself as to any

8

advice that a fiduciary obtains in an effort to protect herself from civil or criminal liability." *Id.* at 1066. Such is the case even if the advice relates to plan administration. *See id.* at 1064-65 (rejecting argument that the fiduciary exception applies "whenever otherwise privileged legal advice 'relates to' fiduciary matters").

First, Plaintiffs challenge Entry Nos. 3, 5-10, and 19-36. (Dkt. No. 116 at 2.) Plaintiffs argue that the privilege log "descriptions indicate that the communications concern plan administration, and not the fiduciaries' personal liability." (*Id.*) Plaintiffs, however, focus solely on whether the description concerns matters of plan administration or settlor functions that fall outside of the fiduciary exception; Plaintiffs do not acknowledge that each of these entries also state that the legal advice sought "implicat[es] potential fiduciary risk concerns." (Dkt. No. 116-1 at Nos. 3, 5-10, 19-36.) Thus, while the advice concerns plan administration, it also involves risks to the fiduciaries, therefore falling outside of the fiduciary exception. *See Mett*, 178 F.3d at 1066. The Court finds these entries were properly withheld.

Second, Plaintiffs challenge Entry No. 39, which is "[p]rivileged email . . . from in-house counsel . . . providing legal advice regarding historical approach for allocating expenses to the RSP [("Retirement Savings Plan")]." (Dkt. No. 116 at 2.) The Court conducted an in-camera review of this document. (*See* Dkt. No. 124.) The Court finds that the documents were not obtained by a fiduciary to protect herself from civil or criminal liability; instead, they are general guidelines concerning when expenses may be charged to the RSP. Entry No. 39 must be produced.

Third, Plaintiffs challenge Entry Nos. 17, 43, and 53-55, on the ground that the descriptions "indicate that it may concern fiduciary acts . . . ." (Dkt. No. 116 at 3.) Entry No. 17 is described as a "[p]rivileged presentation by outside counsel Joan Disler, Esq. related to fiduciary risk." (Dkt. No. 116-1 at No. 17.) Plaintiffs argue that the fiduciary privilege does not apply because "advice about fiduciary best practices is for the benefit of participants, even if it also intended to prevent the fiduciaries from taking any actions that might expose them to personal liability." (Dkt. No. 116 at 3.) If, however, the advice was obtained to protect the fiduciary from legal liability, the attorney-client privilege attaches even if the advice is related to plan

9

administration. *See Mett*, 178 F.3d at 1066.  With respect to Entry Nos. 43 and 53-55, these entries concern "settlor decisions" or a "Plan Amendment," which Plaintiffs do not dispute was a settlor function. (Dkt. No. 116-1 at Nos. 43, 53-55; *see also* Dkt. No. 116 at 4.) "'Decisions made by a person or entity while acting in its settlor capacity do not trigger ERISA's fiduciary duties.'" *Ronches v. Dickerson Empl. Benefits*, Case No. CV 09-4279 MMM (PJWx), 2009 WL 10669571, at *11 (C.D. Cal. Oct. 30, 2009) (quoting *Reynolds v. Edison Int'l*, 238 F.3d 430 (Table), 2000 WL 145937, at *1 (9th Cir. Oct. 2, 2000).) Plaintiffs, however, argue that it is not clear if the advice was provided in a settlor capacity or a fiduciary capacity. (Dkt. No. 116 at 3.) The descriptions are clear that the advice concerned settlor functions, and Plaintiffs provide no argument for why the advice about settlor capacity would implicate any fiduciary actions. The Court therefore finds that these entries were properly withheld.

Finally, Plaintiffs challenge Entry Nos. 1-2 and 61-70, on the ground that it is conclusory that the withheld information is privileged. (Dkt. No. 116 at 3.) Entry Nos. 1-2 both state that they concern requests for legal advice to in-house counsel "regarding potential fiduciary risk concerns." (Dkt. No. 116-1 at Nos. 1-2.) The Court finds this to provide sufficient information to show that the fiduciary exception does not apply, and that these entries were properly withheld. Entry No. 61 states that it is a "Privileged calendar invitation to meeting with outside counsel . . . and in-house counsel teams," while Entry Nos. 62-70 state that they concern "[r]edacted description of privileged legal update from in-house counsel . . . ." (Dkt. No. 116-1 at Nos. 61-70.) The Court conducted an in-camera review of these documents. (*See* Dkt. No. 124.) The Court finds that these documents do not concern legal advice; instead, they are brief descriptions of the general topic that in-house counsel will be providing at an upcoming meeting. The redacted information does not describe what the legal advice is. Therefore, Entry Nos. 61-70 must be produced.

### D. Joint Discovery Letter No. 4 (Dkt. No. 117)

Joint Discovery Letter No. 4 concerns Defendants' Request for Production Nos. 12-14, which seek discovery related to Plaintiff's typicality and adequacy as class representatives. (Dkt. No. 117 at 1.) Plaintiffs have identified three non-privileged documents that are "arguably

10

responsive" to Defendants' Requests, but refuse to produce them because they are "not relevant." (*Id.* at 3.) Plaintiffs further argue that production of these documents could "unreasonably expose Plaintiffs to embarrassment and harassment," citing to cases that prohibited forensic imaging of a party's electronic devices.

The documents must be produced. Plaintiffs admit that the documents are responsive to Defendants' requests, and they do not argue in the discovery letter that Defendants' requests seek irrelevant information.[5] It is therefore not clear why the responsive documents would not have some relevance as well. Further, the production of three documents is significantly lower than the forensic imaging of a party's electronic device, the latter of which would involve a multitude of documents that would be completely immaterial to the instant case.

### E. Joint Discovery Letter No. 5 (Dkt. No. 119)

Finally, Joint Discovery Letter No. 5 concerns Plaintiffs' Request for Production No. 20, which seeks documents concerning the investment of securities lending cash collateral for the BlackRock CTIs. (Dkt. No. 119 at 1.) Again, securities lending is the practice where securities owned by the fund are lent to the borrower in exchange for collateral, which in turn is held in interest-bearing Short Term Investment Funds ("STIFs") to generate additional revenue for the CTIs. (*Id.*) Here, Plaintiffs are seeking two categories of information: (1) documents and communications concerning how the STIFs were selected, and (2) documents and communications regarding how the investments in the STIFs' portfolios were monitored and selected. (*Id.* at 2.)

First, with respect to the selection of STIFs, Plaintiffs argue that such information is relevant because Plaintiffs have alleged that Defendant BTC improperly invested all of the collateral in its own proprietary STIFs, which were substantially more expensive than similar

---

[5] Plaintiffs cite to *In re: Coca-cola Products Marketing and Sales Practices Litigation (No. II)*, Case No. 14-md-2555-JSW (MEJ), 2016 WL 6245899 (N.D. Cal. Oct. 26, 2016), for the proposition that documents that were responsive to the party's request could include irrelevant communications and other information completely unrelated to the claims at issue. (Dkt. No. 117 at 4.) There, however, the district court explained that the requests themselves were so broad that a response could include irrelevant information. *In re: Coca-cola*, 2016 WL 6245899, at *5. Plaintiffs make no argument here that the requests at issue are similarly broad.

11

funds. (Dkt. No. 119 at 2; FAC ¶¶ 268-270.) By only selecting their own proprietary STIFs, Defendant BTC reduced the returns the CTIs would earn through investing activities, passed along securities lending risks to the CTIs, and exposed the CTIs to excessive risk and deteriorated collateral value with high fees. (FAC ¶ 274.) Defendants respond that Defendant "BTC invests the securities lending cash collateral in the BTC-managed STIFs at client direction, according to fees, investment objectives, and risk guidelines set forth in the governing documents for the BlackRock CTIs." (Dkt. No. 119 at 4.) In other words, Defendants assert that it is the "client[ who] *instruct*[s] BTC to invest securities lending cash collateral in the BTC-managed STIFs." (*Id.*)

The Court disagrees. While the governing documents describe general objectives and guidelines, they do not *require* that Defendant BTC only invest the collateral in BTC-proprietary STIFs. Indeed, in the Short-Term Investment Funds Overview and Guidelines, the document describes the investment objectives and eligible investments, and states that "[t]he fund *may* invest directly in other STIFs managed by BTC." (Dkt. No. 125, Exh. B at BAIRD_0071404, 71406, 71407, 71408, 71409 (emphasis added).) Likewise, the "16 Things You Should Know" document states that "Funds that engage in securities lending *may* invest cash collateral received from the borrowers in a series of Funds managed by BTC." (Dkt. No. 125, Exh. C at BAIRD_0046148 (emphasis added).) Such language is permissive, not mandatory. Furthermore, within these guidelines -- which again, do not require that Defendant BTC only invest in BTC-proprietary STIFs -- the manager "is granted full discretionary investment authority to invest the Account," demonstrating that Defendant BTC had discretion in how to investment the cash collateral. (Dkt. No. 125, Exh. D at BAIRD_0000347.) The fact that the manager may not have unfettered discretion does not mean there was no discretion; Defendant BTC was able to invest the collateral pursuant to general guidelines, and allegedly chose to invest solely in BTC-proprietary STIFs. Thus, Defendants have not shown that Defendant BTC only invested in BTC-proprietary STIFs at client direction, and information on how Defendant BTC selected the STIFs is relevant to Plaintiffs' claims regarding Defendants' alleged breach of their fiduciary duties.

Second, as to the selection and monitoring of the STIFs' investments, Plaintiffs argue that

this information is relevant because Plaintiffs have "allege[d] that BTC engages in impermissible self-dealing and fiduciary breaches by taking excessive risk with the 'synthetic STIFs' which hold complex, sub-prime investments," and that Defendant BTC deliberately chose "high-risk/high-reward investments to maximize BTC's securities lending fees while passing all the risk of loss on to the CTI Class." (Dkt. No. 119 at 3.) Defendants respond that this information is irrelevant because Plaintiffs have not pled a theory that the STIFs were imprudently managed or unduly risky. (*Id.* at 4-5.)

The Court finds that Plaintiffs have sufficiently alleged that the "synthetic STIFs" were risky investments, and that those investments caused losses to Plaintiffs. Specifically, in the amended complaint, Plaintiff alleges that Defendant BTC invested a substantial amount of cash collateral into the "synthetic STIF," which "is more expensive than the traditional STIF and permits investments in riskier assets than the traditional STIF . . . ." (FAC ¶ 277.) Plaintiffs also allege that Defendant BTC's decision to invest in these riskier synthetic STIFs "have a material impact on the growth of the retirement plan assets invested in the BlackRock CTIs." (FAC ¶ 279.) Moreover, how these synthetic STIFs were managed is relevant to show that the synthetic STIFs were, in fact, riskier than other STIFs, and whether the decisions caused the losses alleged.

In the alternative, Defendants argue that Plaintiffs "never identified the particular investments they believe to be imprudent, the dates of those investments, the associated losses, the available alternatives, or any other circumstantial details about Defendants' purported 'imprudence.'" (Dkt. No. 119 at 5.) Defendants, however, cite no authority that would require this level of detail in order to obtain discovery. Defendants also argue that they cannot conduct a search based on conclusory assertions of "mismanagement," but Plaintiffs' discovery request is not limited to such matters; Plaintiffs seek documents regarding the *management* of the STIFs, specifically the selection and monitoring of the investments, in order to show that they were mismanaged.

The Court concludes that the requested discovery is permissible. The Court will, however, limit the discovery of how the STIFs' investments were selected and monitored to the synthetic STIFs only, as Plaintiffs have only alleged that there was undue risk as to those particular STIFs.

13

(*See* FAC ¶ 277.) Otherwise, Plaintiffs' allegations regarding the investment in BTC-proprietary STIFs are concerned with the expenses charged, not the specific investments chosen by the non-synthetic STIFs.[6] (*See* FAC ¶¶ 267-272.)

## IV. CONCLUSION

The Court will require production of the following discovery:

(1) All responsive documents to Plaintiffs' Request for Production No. 34, to the extent such documents already exist;

(2) Privilege log Entry Nos. 39 and 61-70;

(3) The three non-privileged documents in response to Defendants' Request for Production Nos. 12-14; and

(4) All responsive documents to Plaintiffs' Request for Production No. 20, excluding documents concerning the selection and monitoring of investments in non-synthetic STIFs.

As to Plaintiffs' Request for Production No. 33, the parties are ordered to meet and confer (preferably in person) to narrow the request, taking into consideration both proportionality and the Court's finding that the documents requested are relevant to Plaintiffs' case. If the parties are unable to reach an agreement regarding the scope of the document production, the parties shall file another joint letter (not to exceed five pages) explaining each issue remaining in dispute, each party's final substantive position, and final proposed compromise on each issue, including relevant legal authority. (Judge Westmore Standing Order ¶ 13(c).)

IT IS SO ORDERED.

Dated: July 20, 2018

KANDIS A. WESTMORE
United States Magistrate Judge

---

[6] At the hearing, Plaintiffs argued that it had put Defendants on notice that all of the STIFs were risky. The Court disagrees. The operative complaint focuses on the risks of the synthetic STIFs, and further distinguishes the synthetic STIFs from BTC's other STIFs by alleging that "BTC has directed substantially more assets into its Synthetic STIFs than it has directed into its cheaper, traditional STIFs." (FAC ¶ 278.)