1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    CHARLES BAIRD, et al.,                  Case No.  17-cv-01892-HSG

8                Plaintiffs,                 **ORDER ON MOTIONS TO DISMISS
                                             AND ADMINISTRATIVE MOTIONS
9          v.                                TO SEAL**

10   BLACKROCK INSTITUTIONAL TRUST           Re: Dkt. Nos. 177, 178, 180, 181, 210, 211,
     COMPANY, N.A., et al.,                  224, 225, 283
11
                Defendants.
12

13          Pending before the Court are motions to dismiss the Second Amended Complaint ("SAC"),

14   separately filed by the BlackRock Defendants (defined in Section I(B), *infra*) and Mercer

15   Investment Consulting ("Mercer").  Dkt. Nos. 178 ("Mercer Mot."), 181 ("Mot.").  The parties

16   have also filed administrative motions to seal in connection with their briefs.  Dkt. Nos. 177, 180,

17   210, 211, 224, 225, 283.  For the reasons articulated below, the Court **GRANTS IN PART AND**

18   **DENIES IN PART** the BlackRock Defendants' motion to dismiss, **GRANTS** Mercer's motion to

19   dismiss, and **GRANTS** the administrative motions to seal.

20   **I.     BACKGROUND**

21          This ERISA action arises from a complicated set of facts concerning the offering of certain

22   investment options available in the BlackRock Retirement Savings Plan (the "BlackRock Plan" or

23   "Plan"), a 401(k) plan offered by BlackRock, Inc. ("BlackRock") to its employees.  Plaintiffs

24   Charles Baird and Laura Slayton are both participants in the BlackRock Plan.  Dkt. No. 154

25   ("SAC") ¶¶ 17, 22.  For the purpose of deciding the motions to dismiss, the following allegations

26   are taken as true.

27          **A.  The BlackRock Plan**

28          Defendant BlackRock is one of the largest investment management companies and

United States District Court
Northern District of California

engages in various investment-related activities, such as securities lending, investment banking, and investment management.  *Id.* ¶ 42.  BlackRock is the sponsor of the BlackRock Plan.  *Id.*  The Management Development & Compensation Committee ("MDCC") of the BlackRock Board of Directors oversees all of BlackRock's employee benefit plans.  *Id.* ¶ 36.  To assist with its oversight responsibilities, the MDCC created the "Retirement Committee," which is the Plan Administrator of the BlackRock Plan.[1]  *Id.* ¶ 54.  The Retirement Committee has two subcommittees: (1) the "Investment Committee,"[2] which selects investments for the Plan, and (2) the "Administrative Committee,"[3] which administers the BlackRock Plan.  Mercer, a third-party consultant, provides investment advice to the Plan.  *Id.* ¶ 83.

The BlackRock Plan is funded by participants' voluntary contributions and employer matching contributions.  *Id.* ¶ 96.  The Retirement and Investment Committees select investment options for the Plan, and participants may choose options for the investment of their contributions.  *Id.* ¶¶ 97–98.  Depending on the funds selected, participants may have to pay varying fees and expenses.  *Id.* ¶ 99.  The investment options available in the Plan include collective trust investments ("CTIs"), which are similar to mutual funds but are only available to institutional investors (for example, 401(k) plans).  *Id.* ¶¶ 164–65.  Because they are not offered to individual investors, CTIs are generally exempt from certain regulatory requirements, such as the securities laws and associated disclosure requirements.  *Id.* ¶ 165.  Instead, CTIs are subject to the rules and regulations promulgated by the Department of Labor ("DOL") and the Office of the Comptroller of the Currency ("OCC").  *Id.*

The majority of the BlackRock Plan's assets are invested in CTIs, specifically CTIs that

---

[1] The individual members of the Retirement Committee during the Class Period were: Anne Ackerley, Catherine Bolz, Chip Castille, Paige Dickow, Daniel A. Dunay, Joseph Feliciani Jr., Kevin Holt, Anne Marie Petach, and Jeffrey A. Smith.  SAC ¶ 65.

[2] The individual members of the Investment Committee during the Class Period were: Anne Ackerley, Chip Castille, Amy Engel, Nancy Everett, Joe Feliciani, Jr., Michael Fredericks, Corin Frost, Daniel Gamba, Kevin Holt, Chris Jones, Philippe Matsumoto, John Perlowski, Ann Marie Petach, Andy Phillips, Kurt Schansinger, Tom Skrobe, and Katie Nedl.  SAC ¶¶ 68–69.

[3] The individual members of the Administrative Committee during the Class Period were: Catherine Bolz, Chip Castille, Marc Comerchero, Joel Davies, John Davis, Paige Dickow, Daniel A. Dunay, Joe Feliciani, Jr., Kevin Holt, Milan Lint, Laraine McKinnon, Katie Nedl, Ann Marie Petach, and Jeffrey A. Smith.  SAC ¶ 81.

United States District Court
Northern District of California

are sponsored by Defendant BlackRock Institutional Trust Company, N.A. ("BTC").  *Id.* ¶¶ 162–66.  BTC is a subsidiary of BlackRock and is a national banking association that operates as a limited purpose trust company.  *Id.* ¶ 26.  As the sponsor for many of these CTIs, BTC has discretionary authority to manage and invest the BlackRock Plan's assets held in the CTIs.  *Id.* ¶ 30.  Per an Investment Management Agreement dated November 23, 2010 ("IMA"), BTC is the investment manager for these BTC-sponsored CTIs.  *Id.* ¶ 166.

### B. Plaintiffs' Allegations

Plaintiffs filed this putative class action pursuant to §§ 502(a)(2) and (a)(3) of ERISA. SAC ¶ 1.  Plaintiffs seek to represent two classes: the "BlackRock Plan Class," which consists of all participants and beneficiaries in the BlackRock Plan, and the "CTI Class," which consists of all participants and beneficiaries whose contributions were invested directly or indirectly in BTC-sponsored CTIs.  *Id.*  Plaintiffs bring this action against BlackRock, BTC, the MDCC, the Retirement Committee and its members, the Investment Committee and its members, the Administrative Committee and its members (collectively, the "BlackRock Defendants"), and Mercer (collectively with the BlackRock Defendants, "Defendants").  *Id.* ¶¶ 26–92.

The core of Plaintiffs' voluminous complaint is the contention that the BlackRock Defendants improperly favored their own proprietary funds, including the BTC-sponsored CTIs, which led to unfavorable returns for the participants.  *See id.* ¶¶ 118–285.  Plaintiffs also allege that the BlackRock Defendants failed to disclose fees associated with the CTIs, as is required by the Investment Company Act and its regulations.  *Id.* ¶¶ 286–303.  The Court summarizes the main points of Plaintiffs' allegations below.

*Preferential Treatment of BlackRock Funds*.  The Retirement and Investment Committee Defendants allegedly had a pattern and practice of giving "preferential treatment" to BlackRock proprietary funds.  *Id.* ¶¶ 118–33.  To illustrate, Plaintiffs assert that BlackRock funds performing poorly and placed "on watch" were still available in the Plan's lineup, replacing non-BlackRock funds with higher ratings that were not placed "on watch."  *Id.* ¶¶ 123–28.  As another example, Plaintiffs allege that the BlackRock Defendants failed to remove the underperforming and expensive BlackRock Low Duration Bond Fund.  *Id.* ¶¶ 264–76.  According to Plaintiff, "not a

single non-affiliated fund has been added to the BlackRock Plan" since "at least 2010 to present." *Id*. ¶ 130.  This failure to diversify also allegedly concentrates risk, increasing the chance that a "systemic failure that would affect all funds." *Id*. ¶¶ 281–85.

*Mercer "Rubber Stamped" Decisions*.  Plaintiffs allege that Mercer would tailor its recommendations to the Investment Committee based on what Mercer knew the Investment Committee wanted to hear:  the Plan should only invest in BlackRock's proprietary funds.  *Id*. ¶¶ 134–61.  Plaintiffs give examples of Mercer allegedly providing inconsistent advice to the Investment Committee as compared to Mercer's non-BlackRock clients, such as advising non-BlackRock clients against investing in certain BlackRock funds that it then recommended to the Investment Committee.  *Id*. ¶¶ 143–52.  The BlackRock Defendants purportedly tried to "curry favor" with Mercer to obtain favorable ratings for their products.  *Id*. ¶ 159.

*BTC-Sponsored CTIs Had Excessive Fees & Engaged in Risky Securities Lending*.  The SAC alleges that the Retirement and Investment Committees favored BTC-sponsored CTIs that were engaged in risky securities lending, to the benefit of the BlackRock Defendants but to the detriment of the participants.  *Id*. ¶¶ 162–95.  Plaintiffs posit that as of the end of 2016, approximately 94% of Plan assets were invested in BlackRock proprietary funds, many of them CTIs engaged in securities lending.  *Id*. ¶¶ 173–74.  Securities lending is a practice by which securities owned by CTIs are "temporarily transferred" to a borrower (for example, another banking institution or hedge fund).  *Id*. ¶¶ 175–76.  In exchange, the borrower posts cash collateral that generally exceeds the value of the borrowed securities.  *Id*. ¶ 176.  A CTI can use the cash to invest in a short term investment vehicle that may generate a return, and any return generated is income for the CTI.  *See id*.  The borrower then returns the securities to the CTI, and the CTI returns the initial cash collateral plus any reimbursement.  *See id*.  These securities lending transactions are typically done through a lending agent, which receives a portion of the income as a fee.  *See id*.  In this case, BTC is the lending agent, and Plaintiffs allege that it takes an excessive 50% fee of the income generated through these transactions, thereby purportedly diminishing the participants' return.  *Id*. ¶ 181.

Plaintiffs also claim that BTC used the cash collateral to invest in "overly risky BTC-

4

sponsored 'synthetic' short term investment funds" ("STIFs"), again to the disadvantage of the participants but to the benefit of the BlackRock Defendants. *Id*. ¶ 182. These STIFs were purportedly risky because BTC invested the STIFs in "imprudent investments." *Id*. ¶ 420. The STIFs also charge a higher fee (measured as basis points, or "bps," which is a percentage of the asset base) than other market participants. *Id*. ¶ 185.

*Master-Feeder Structure Funds "Hide" Fees*. BlackRock's LifePath funds, a series of target-date BTC-sponsored CTIs, are the Plan's default investment if a participant does not affirmatively select a specific investment option. *Id*. ¶ 196. Per Plaintiffs, these LifePath funds have a "master-feeder structure," which means that a "feeder fund" uses pooled capital from the participants to purchase shares of other master or feeder funds. *Id*. ¶ 198. The LifePath funds purportedly only invest in other BlackRock funds. *Id*. ¶ 199. This type of layered structure allegedly allows BlackRock to hide fees, which purportedly diminishes participants' returns while giving the BlackRock Defendants and other subsidiaries substantial compensation. *Id*. ¶¶ 202–04, 211–16. To emphasize this point, Plaintiffs claim that the target-date funds offered by BlackRock in the Federal Thrift Savings Plan ("TSP"), which are indexed to the same underlying assets as the LifePath funds and are also managed by BlackRock, outperformed the LifePath funds "by 5.6% on average during this period" because the TSP funds did not have LifePath's excessive fees. *Id*. ¶¶ 223–31.

*BlackRock Defendants Used Plan Funds to Seed CTIs*. Plaintiffs also allege that the Retirement and Investment Committees used Plan funds to seed newly-launched BlackRock CTIs that were expensive and underperforming. *Id*. ¶¶ 244–63. In addition, these new CTIs were added to the Plan's lineup purportedly in violation of the Plan's investment guidelines, as some of the new CTIs only had a performance history of a couple months when the investment guidelines required a performance history of at least three years. *Id*. ¶¶ 260–63. Seeding the new BlackRock CTIs was allegedly harmful to the participants but beneficial to the BlackRock Defendants, as it made these new CTIs more attractive to the market and convinced other institutional investors to invest in them. *Id*. ¶¶ 258–59.

*Failure to Disclose Fees*. According to Plaintiffs, the Administrative Committee, to which

1  the Retirement Committee delegated the duty to ensure compliance with reporting and disclosure

2  requirements, is required to disclose fees that would reduce the "alternative's rate of return." *Id.*

3  ¶¶ 286–91.  This purportedly includes disclosure of securities lending fees, which were not

4  disclosed and were "hidden" through the layered fund structures. *Id.* ¶¶ 186, 293–303.  Because

5  these fees were not disclosed, Plaintiffs allege that the participant disclosures were not adequate or

6  accurate. *Id.* ¶ 303.

7          *CTI Class Allegations*.  Plaintiffs also seek to represent a class of all those who invested in

8  BlackRock proprietary CTIs, including other employee plans that invested in those CTIs.

9  Plaintiffs allege that BTC, as the trustee and investment manager to the BlackRock CTIs, is a

10  fiduciary to the participants and beneficiaries of benefit plans that invest in the BlackRock CTIs.

11  *Id.* ¶¶ 313–16.  The allegations on behalf of the CTI Class arise from the same general set of facts

12  alleged regarding excessive securities lending fees, improper preferential treatment in selecting

13  proprietary CTIs, and BTC's imprudent portfolio management of the overly risky STIFs.  *Id.* ¶¶

14  331–480.

15          **C.  Causes of Action**

16          Plaintiffs allege the following seven causes of action on behalf of the BlackRock Plan

17  Class:  (1) breach of fiduciary duties for failing to prudently monitor, select, and diversify

18  investments, in violation of ERISA § 404, 29 U.S.C. § 1104, against the Retirement and

19  Investment Committee Defendants; (2) engaging in party-in-interest transactions, in violation of

20  ERISA § 406(a), 29 U.S.C. § 1106(a), against BlackRock, BTC, the Retirement Committee, and

21  the Investment Committee Defendants; (3) engaging in prohibited transactions, in violation of

22  ERISA § 406(b), 29 U.S.C. § 1106(b), against BTC, the Retirement Committee, and Investment

23  Committee Defendants; (4) breach of fiduciary duties for failing to prudently provide investment

24  advice and engaging in party-in-interest transactions, in violation of ERISA §§ 404 and 406, 29

25  U.S.C. §§ 1104 and 1106, against Mercer; (5) breach of fiduciary duties for failing to prudently

26  disclose fees, in violation of ERISA § 404, 29 U.S.C. § 1104, against the Administrative

27  Committee Defendants; (6) failure to monitor other fiduciaries, in violation of ERISA § 404, 29

28  U.S.C. § 1104, against BlackRock, the MDCC, the Retirement Committee, and Investment

United States District Court
Northern District of California

6

1  Committee Defendants; and (7) co-fiduciary liability under ERISA § 405, 29 U.S.C. § 1105,

2  against all Defendants.  *Id.* ¶¶ 502–76.

3       Plaintiffs also allege the following three causes of action on behalf of the CTI Class against

4  BlackRock and BTC, based on the "management of the BlackRock CTIs": (8) violation of ERISA

5  § 404, 29 U.S.C. § 1104; (9) violation of ERISA § 406, 29 U.S.C. § 1106; and (10) co-fiduciary

6  liability under ERISA § 405, 29 U.S.C. § 1105.  *Id.* ¶ 577–619.

7  **II.**     **REQUEST FOR JUDICIAL NOTICE**

8       **A. Legal Standard**

9          **i. Judicial Notice**

10       In *Khoja v. Orexigen Therapeutics*, the Ninth Circuit clarified the judicial notice rule and

11  incorporation by reference doctrine.  *See* 899 F.3d 988 (9th Cir. 2018).  Under Federal Rule of

12  Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute because

13  it … can be accurately and readily determined from sources whose accuracy cannot reasonably be

14  questioned." Fed. R. Evid. 201(b)(2).  Accordingly, a court may take "judicial notice of matters of

15  public record," but "cannot take judicial notice of disputed facts contained in such public records."

16  *Khoja*, 899 F.3d at 999 (citation and quotations omitted).  The Ninth Circuit has clarified that if a

17  court takes judicial notice of a document, it must specify what facts it judicially noticed from the

18  document.  *Id*. at 999.  Further, "[j]ust because the document itself is susceptible to judicial notice

19  does not mean that every assertion of fact within that document is judicially noticeable for its

20  truth."  *Id*.  As an example, the Ninth Circuit held that for a transcript of a conference call, the

21  court may take judicial notice of the fact that there was a conference call on the specified date, but

22  may not take judicial notice of a fact mentioned in the transcript, because the substance "is subject

23  to varying interpretations, and there is a reasonable dispute as to what the [document] establishes."

24  *Id*. at 999–1000.

25          **ii. Incorporation by Reference**

26       Separately, the incorporation by reference doctrine is a judicially-created doctrine that

27  allows a court to consider certain documents as though they were part of the complaint itself.  *Id*.

28  at 1002.  This is to prevent plaintiffs from cherry-picking certain portions of documents that

United States District Court
Northern District of California

support their claims, while omitting portions that weaken their claims.  *Id.*  Incorporation by reference is appropriate "if the plaintiff refers exclusively to the document or the document forms the basis of plaintiff's claim."  *Khoja*, 899 F.3d at 1002.  However, "the mere mention of the existence of a document is insufficient to incorporate the contents" of a document.  *Id.* at 1002. And while a court "may assume [an incorporated document's] contents are true for purposes of a motion to dismiss … it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint."  *Id.*

### B. Discussion

Defendants initially requested that the Court take judicial notice of or consider incorporated by reference the following long list of documents:

| Exhibit | Document |
|---|---|
| BlackRock Ex. C | BlackRock Retirement Savings Plan – Guideline & Fee Agreement (October 17, 2016) |
| BlackRock Ex. D | Audited Financial Statements for Investment Funds for Employee Benefit Trusts, F Series (December 31, 2014) |
| BlackRock Ex. E | Audited Financial Statements for Investment Funds for Employee Benefit Trusts, E Series (December 31, 2014) |
| BlackRock Ex. F | Participant Disclosure of Plan (August 20, 2013) |
| BlackRock Ex. G | Participant Disclosure of Plan (October 13, 2016) |
| BlackRock Ex. H | "16 Things You Should Know: Information about BTC" (June 2010) |
| BlackRock Ex. I | Plan of BlackRock Institutional Trust Company, N.A. Investment Funds for Employee Benefit Trusts Funds (December 31, 2011) ("CTI Plan") |
| BlackRock Ex. J | BlackRock Investment Management Agreement (November 23, 2010) ("IMA") |
| BlackRock Ex. K | BlackRock Short-Term Investment Funds: Overview and Guidelines ("STIF Guidelines") |
| BlackRock Ex. L | Blackrock Funds II (BlackRock Low Duration Fund) Prospectus (January 28, 2016) |
| BlackRock Ex. M | BlackRock Global Allocation Fund, Inc. Prospectus (February 28, 2014) |
| BlackRock Ex. N | Audited Financial Statements for Employee Benefit Trusts, U.S. Short Term Investment Series II (December 31, 2011) |
| BlackRock Ex. O | December 2016 and February 2017 Supplements to "16 Things You Should Know" |
| Mercer Ex. A | Form 5500, Annual Return/Report of BlackRock Employee Benefit Plan (2017) |
| Mercer Ex. B | Participant Fee Disclosure of Plan (March 17, 2017) |
| Mercer Ex. C (BlackRock Ex. C) | BlackRock Retirement Savings Plan – Guideline & Fee Agreement (October 17, 2016) |
| Mercer Ex. D (BlackRock Ex. F) | Participant Disclosure of Plan (August 20, 2013) |
| Mercer Ex. E | Federal Thrift Savings Fund Financial Statements (December |

| Exhibit | Document |
|---|---|
| | 31, 2017 and 2016) |
| Mercer Ex. F | Form 5500, Annual Return/Report of the Vanguard Retirement and Savings Plan (2016) |

Dkt. Nos. 179, 182.  After a careful review of the exhibits and the parties' arguments, the Court found that it could not take judicial notice of or consider incorporated by reference the majority of Defendants' exhibits.  For the majority, Defendants request that the Court consider the documents for the truth of the information contained in them to rebut Plaintiffs' allegations, which *Khoja* prohibits.  *See Khoja*, 899 F.3d at 1014; *see, e.g.*, Mot. at 2, 19 (citing BlackRock Exhibit C and seeking finding that, "contrary to the SAC," the "manner in which securities lending compensation accrues to BTC" was not unreasonable).

Despite Defendants' contentions otherwise, many of these documents are not incorporated by reference.  For example, the BlackRock Defendants argue that Exhibits F and G, which are participant fee disclosures, are incorporated by reference and judicially noticeable, but the SAC's brief references to the participant fee disclosures do not make them the "basis of plaintiff's claim." *See Khoja*, 899 F.3d at 1002; Dkt. No. 181 at 8.  The same is true of the "16 Things You Should Know" ("16 Things") documents (BlackRock Exhibits H and O), which were referenced only twice in the SAC.  *See* SAC ¶ 615.  Those brief references do not establish that the "16 Things" documents are central to the claims, as Plaintiffs do not allege that those documents govern the Plan.  *See Khoja*, 899 F.3d at 1002.  And while some documents, such as the Fund Prospectuses and Form 5500 (BlackRock Exhibits L and M, and Mercer Exhibits A, E, and F), may be judicially noticeable for their existence, the Court may not take judicial notice of the truth of the information contained in them if Defendants are attempting to factually rebut Plaintiffs' allegations.  *Id*. at 999–1000.

Because Defendants submitted such voluminous materials beyond the SAC, the Court informed the parties that it was inclined to convert the motions to dismiss to motions for summary judgment, but afforded the parties a chance to submit supplemental briefing to identify issues that they believed could be resolved without the Court considering the extrinsic materials.  Dkt. Nos. 276, 277.  After supplemental briefing, Defendants withdrew the request as to some of their documents.  Dkt. Nos. 280, 281.  All parties now agree that BlackRock Exhibits I, J, and K are

incorporated by reference and can be considered by the Court. *See* Dkt. Nos. 280, 281, 283-3. But the parties still disagree as to whether the Court may consider the following exhibits:  the "16 Things" documents (BlackRock Exhibits H and O); the Fund Prospectuses (BlackRock Exhibits L and M); the 2017 Form 5500 of the Plan (Mercer Exhibit A); and the Plan participant fee disclosures (Mercer Exhibits B and D).  *See id.*

The parties' supplemental briefing does not persuade the Court that it may take judicial notice of the remaining disputed documents or find them to be incorporated by reference.  In light of *Khoja*, the Court is mindful of the risk that the judicial notice rule and incorporation by reference doctrines can lead to the consideration of extrinsic evidence to resolve factual disputes, which is not proper at the pleading stage.  *See Rollins v. Dignity Health*, 338 F. Supp. 3d 1025, 1031 (N.D. Cal. 2018) ("[Defendant] is not explaining or arguing the allegations in Plaintiffs' FAC—it is trying to factually rebut them.  As *Khoja* makes clear, to grant the request for judicial notice would improperly convert this Rule 12(b)(6) motion into a motion for summary judgment under Rule 56.").  Accordingly, the Court **GRANTS** Defendants' request for the Court to consider BlackRock Exhibits I, J, and K.  The Court also takes judicial notice of BlackRock Exhibits L and M, but only to recognize their existence.  The Court **DENIES** Defendants' requests as to all remaining exhibits.

## III.  MOTIONS TO DISMISS

As a general matter, the Court notes that many of Defendants' arguments implicate factual disputes that are not properly resolved at the motion to dismiss stage.  Although the Court provided the parties with an opportunity to support conversion of the motions to dismiss into motions for summary judgment, Defendants declined to do.  Instead, they contend that, despite their heavy reliance on documents outside the face of the SAC, certain claims should be dismissed.  At the motion to dismiss stage, the Court does not resolve factual disputes, but rather simply assesses whether the SAC plausibly pleads a claim for relief.  With that standard in mind, the Court addresses Defendants' arguments.

### A.  Legal Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain

statement of the claim showing that the pleader is entitled to relief[.]"  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  And even where facts are accepted as true, "a plaintiff may plead [him]self out of court" if he "plead[s] facts which establish that he cannot prevail on his . . . claim."  *Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quotation marks and citation omitted).

If dismissal is appropriate under Rule 12(b)(6), a court "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quotation marks and citation omitted).

### B.  BlackRock Plan Claims Against the BlackRock Defendants

#### i.  Breach of Fiduciary Duties (Count I, V)

Under ERISA § 404(a), fiduciaries have the following duties:  the duty of loyalty, the duty of prudence, the duty to diversify investments, and the duty to act in accordance with the governing plan documents and instruments.  29 U.S.C. § 1104(a)(1).  "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) ("*Tibble II*").  Plaintiffs allege that Defendants violated the first

1    three duties of loyalty, prudence, and diversification.

2         The duty of loyalty requires fiduciaries to discharge their duties "solely in the interest of

3    the participants and beneficiaries," for the "exclusive" purpose of providing benefits to the

4    participants and "defraying reasonable expenses of administering the plan." 29 U.S.C.

5    § 1104(a)(1)(A). The duty of loyalty prohibits a trustee "from engaging in transactions that

6    involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary

7    duties and personal interests." *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1069 (N.D. Cal.

8    2017) (quoting Restatement (Third) of Trusts § 78 (2007)).

9         With respect to the duty of prudence, a fiduciary must act "with the type of 'care, skill,

10   prudence, and diligence under the circumstances' not of a lay person, but of one experienced and

11   knowledgeable with these matters." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1133 (9th Cir. 2013)

12   ("*Tibble I*"), *vacated on other grounds*, 135 S. Ct. 1823 (2015) (citing 29 U.S.C. § 1104(a)(1)(B)).

13   Under this standard, courts must analyze the fiduciary's conduct at the time of the challenged

14   transaction and determine whether the fiduciary employed "appropriate methods to investigate the

15   merits of the investment and to structure the investment." *Donovan v. Mazzola*, 716 F.2d 1226,

16   1232 (9th Cir. 1983). Under the duty of prudence, a fiduciary also has a continuing duty to

17   monitor investments and remove imprudent ones. *Tibble II*, 135 S. Ct. at 1828–29. And "[c]ourts

18   are in broad accord that engaging consultants, even well-qualified and impartial ones, will not

19   alone satisfy the duty of prudence." *Tibble I*, 729 F.3d at 1134.

20        A plan fiduciary also has the duty to diversify investments "so as to minimize the risk of

21   large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C.

22   § 1104(a)(1)(C). "As a general proposition, ERISA's duty to diversify prohibits a fiduciary from

23   investing disproportionately in a particular investment or enterprise." *In re Unisys Sav. Plan*

24   *Litig.*, 74 F.3d 420, 438 (3d Cir. 1996). But the degree of "investment concentration that would

25   violate this requirement to diversify" is not measured by "hard and fast rules or formulas." *Id*.

26   Instead, courts must consider the facts and circumstances of each case. *Id*.

27        Plaintiffs allege that the BlackRock Defendants breached the first three duties by

28   improperly favoring proprietary funds and charging and hiding excessive fees. The Court

United States District Court
Northern District of California

analyzes whether those allegations are sufficient to sustain claims for breach of fiduciary duties.

### 1.   Improperly Favoring BlackRock Proprietary Funds (Count I)

According to Plaintiffs, the Retirement and Investment Committee Defendants breached their fiduciary duties by improperly favoring BlackRock subsidiary funds, to the detriment of Plaintiffs but to the exclusive benefit of the BlackRock Defendants.  SAC ¶¶ 502–10.  The BlackRock Defendants argue that the existence of allegedly "better" alternatives does not say anything about whether the Plan's fiduciary process was prudent, and claim that Mercer's engagement is also evidence of a thorough investigation.  Mot. at 7–12.  Plaintiffs must, the BlackRock Defendants contend, allege "more than the mere fact of affiliation to support an inference of fiduciary breach."  *Id.* at 7 (citing *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 824 (8th Cir. 2018)).

The Court agrees that simply claiming that the Retirement and Investment Committee Defendants chose a disproportionate number of certain investments is not sufficient to plead a breach of fiduciary duties.  *See Terraza*, 241 F. Supp. 3d 1057, 1075 (N.D. Cal. 2017) (finding bare allegations that defendants offered a disproportionate number of non-transparent investment options not sufficient to support breach of fiduciary duty claim).  However, the Court finds that Plaintiffs allege more than just the selection of a disproportionate number of BlackRock proprietary options.  As alleged, the Investment Committee's Investment Policy Statement ("IPS"), which sets forth factors that the committee should consider when "selecting and monitoring investments," states that the "Retirement Committee may make a decision to retain or replace a fund that is on watch within four quarters of the fund being placed on the watch list." SAC ¶¶ 121–22.  However, Plaintiffs claim that BlackRock applied different standards to proprietary and non-proprietary funds.  The Investment Committee Defendants allegedly retained certain BlackRock funds on the watch list for approximately ten quarters, even though the funds had "performance issues and other investors [were] withdrawing their money from the funds."  *Id.* ¶ 124.  In contrast, for a non-proprietary BlackRock Fund, the Investment Committee Defendants allegedly "began searching for [its] replacement … even before it was formally put 'on watch'" and within six months replaced it with a BlackRock proprietary fund that purportedly had a lower

United States District Court
Northern District of California

rating. *Id*. ¶¶ 125–28.  Further, allegedly in contravention of the IPS, the BlackRock Defendants diverted hundreds of millions of dollars from the Plan's assets to seed newly-launched BlackRock funds and added them to the lineup, even though those funds did not have the required performance history of three years. *Id*. ¶¶ 252–63.  These allegations do more than just assert a preference for proprietary funds:  making all inferences in Plaintiffs' favor, they support a reasonable inference that the Retirement and Investment Committee Defendants *improperly* favored their proprietary funds by selecting and retaining the investments without complying with their own policies.

Plaintiffs also allege that BlackRock proprietary funds were underperforming and expensive when compared to alternative options.  Allegations that one fund ultimately performed better than another fund, in the absence of a meaningful benchmark, do not establish that the funds "were an imprudent choice at the outset."  *Meiners*, 898 F.3d at 823 ("No authority requires a fiduciary to pick the best performing fund.").  In addition, an allegation that a plan failed to offer the cheapest investment option is not enough by itself to state a claim for a breach of fiduciary duty.  *See Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) ("The fact that it is possible that some other funds might have had even lower [expense] ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund."); *see also Tibble I*, 729 F.3d at 1135 ("We agree [with the Seventh Circuit].  There are simply too many relevant considerations for a fiduciary[] for that type of bright-line approach to prudence to be tenable.").  But while a fiduciary's decision in the initial selection of funds is judged based on "information available to the fiduciary at the time of each investment and not from the vantage point of hindsight," a fiduciary also has a separate and continuing duty to "monitor investments and remove imprudent ones."  *Terraza*, 241 F. Supp. 3d at 1076 (quotations and citations omitted).

The Court finds that Plaintiffs allege more than just underperformance and a fee differential.  The SAC alleges that the Plan's default funds, the LifePath funds, underperformed "after taking into account the compounding of returns realized every year" by almost 20% when compared to the Dow Jones Target Date benchmark indices.  SAC ¶ 220.  Further, comparing the LifePath funds to the "nearly identical BlackRock funds offered in the [TSP]," which have the

same investment strategies and contain underlying assets indexed to the same indices, the LifePath funds allegedly underperformed by 5.6% on average during the relevant period. *Id.* ¶¶ 223–31. Plaintiffs allege that this variance is because the LifePath funds have "undisclosed fees and layering structure[s] that make the LifePath funds disadvantageous for BlackRock Plan participants and highly profitable for BlackRock." *Id.* ¶ 224. According to the allegations, "[a]t no point during the Class Period did the Investment Committee Defendants consider removing the LifePath Funds as the Plan's default investment option." *Id.* ¶ 234.

Considering all of the factual allegations in the light most favorable to Plaintiffs, Plaintiffs sufficiently plead that the BlackRock Defendants breached their fiduciary duties by improperly favoring BlackRock proprietary funds. *See, e.g.*, *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009) (allegations that the plan offered funds with higher fees than available alternatives, defendants "did not change the options included in the Plan despite the fact that most of them underperformed the market indices they were designed to track," and defendants had a revenue sharing payment with the trustee for inclusion in the plan were sufficient to state a claim for breach of fiduciary duty); *Terraza,* 241 F. Supp. 3d at 1076 (N.D. Cal. 2017) (allegations that the funds underperformed when compared to their benchmark and that defendants refused to replace the underperforming funds because of a relationship with the trustee were sufficient to state a claim); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. SACV151614JLSJCGX, 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016) (allegations that defendants selected affiliated investment options to benefit the defendants, failed to monitor fees and expenses, failed to investigate lower-cost options with comparable performance, and retained high-cost investment options to the detriment of participants were sufficient to sustain a claim). While the BlackRock Defendants very well may have had legitimate reasons to select the challenged funds, that is not a determination the Court may make as a matter of contested fact at this juncture.

### 2.   Undisclosed Fees (Count V)

The SAC also includes allegations that the Administrative Committee Defendants breached their fiduciary duties by failing to disclose the securities lending fees as part of the expense ratio. SAC ¶¶ 286–302, 549–56. According to Plaintiffs, the Administrative Committee

1   Defendants were required to disclose these fees under the DOL's disclosure regulations, codified

2   at 29 C.F.R. § 2550.404a–5.  *Id.* ¶¶ 290–93, 301–02.

3         Pursuant to the duty of loyalty, a plan fiduciary must "communicate to the beneficiary all

4   material facts the trustee knows or should know in connection with the transaction."  *Washington*

5   *v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 504 F.3d 818, 823 (9th Cir. 2007).  Under 29 C.F.R.

6   § 2550.404a–5, the plan administrator must comply with the disclosure requirements set forth in

7   the regulation, and the disclosures must be "complete and accurate."  29 C.F.R. § 2550.404a–5(b).

8   The specific disclosure at issue here is the requirement to disclose "[t]he total annual operating

9   expenses of the investment expressed as a percentage (i.e., expense ratio), calculated in

10  accordance with paragraph (h)(5) of this section."  *Id*. § 2550.404a–5(d)(1)(iv)(A)(2); SAC ¶ 290.

11  Total annual operating expenses are defined as:

12        (c) Any other fees or expenses not included in paragraphs
      (h)(5)(ii)(A) or (B) of this section that reduce the alternative's rate
13        of return (e.g., externally negotiated fees, custodial expenses, legal
      expenses, accounting expenses, transfer agent expenses,
14        recordkeeping fees, administrative fees, separate account expenses,
      mortality and expense risk fees), excluding brokerage costs
15        described in Item 21 of Securities and Exchange Commission Form
      N–1A.

16

17  *Id*. § 2550.404a–5(h)(5)(ii)(c).  The BlackRock Defendants do not dispute that they did not

18  disclose the securities lending fees as part of the expense ratio, but argue that they were not

19  required to do so because those fees are taken from any "additive income," and therefore do not

20  reduce the reduce the rate of return.  Mot. at 15.

21        As support for their position, the BlackRock Defendants argue that "29 C.F.R.

22  § 2550.404a–5(h)(ii)(C) requires fees to be expressed *ex ante* 'assuming no returns.'"  Dkt. No.

23  226 ("Reply") at 8.  The BlackRock Defendants take the "assuming no returns" qualification from

24  a separate provision which requires disclosure of "total annual operating expenses of the

25  investment for a one-year period expressed as a dollar amount for a $1,000 investment (assuming

26  no returns and based on the percentage described in paragraph d(1)(iv)(A)(2) of this section)."  29

27  C.F.R. § 2550.404a–5(d)(1)(iv)(A)(3).  Because an assumption of "no returns" will "always

28  yield[] securities lending fees of zero," the BlackRock Defendants contend they did not have to

United States District Court
Northern District of California

disclose the lending fees.   Reply at 8.

The Court cannot say at this stage that this claim must be dismissed as a matter of law. The Court acknowledges the superficial appeal of the BlackRock Defendants' argument:  if they are only required to include fees that would exist "assuming no returns" in the expense ratio, then because securities lending fees are only deducted if income is generated, *see* SAC ¶¶ 177, 181, it follows that they do not have to disclose those fees.  But the problem with this argument is that the BlackRock Defendants import this qualifier from one section of 29 C.F.R. § 2550.404a–5, specifically (d)(1)(iv)(A)(3), to a separate section without providing any basis or authority for doing so.  The "assuming no returns" condition does not appear in (d)(1)(iv)(A)(2), which sets out the expenses Plaintiffs allege the Administrative Committee Defendants failed to properly disclose.  SAC ¶ 290; *compare* 29 C.F.R. § 2550.404a–5(d)(1)(iv)(A)(2) *with* (A)(3).  Notably, section (h)(5), which provides the definition for "total annual operating expenses" and is expressly referenced in section (d)(1)(iv)(A)(2), does not define total annual operating expenses as expenses assuming no returns.  *See* 29 C.F.R. § 2550.404a–5(h)(5).  Total operating expenses are "other fees or expenses not included in [subsections (ii)(A) or (B)] that reduce the alternative's rate of return."  *Id.* § 2550.404a–5(h)(5)(ii)(C).

The SAC alleges that the securities lending fees fit the definition in section (h)(5). Plaintiffs allege that the "[s]ecurities lending fees and expenses reduce net investment income," as "the higher the securities lending fees and other expenses charged … the lower the rate of return earned by participants."  SAC ¶ 293; *see also id*. ¶ 181 ("BTC—in its role as lending agent—takes 50% of all securities lending income generated by the loan of the BlackRock Plan's assets," therefore allegedly diminishing "Plan participants' returns on [their] investment.").  At this stage, and construing the pleadings in the light most favorable to the non-moving party, Plaintiffs thus have plausibly pled that the securities lending fees diminish participants' returns, such that the Administrative Committee Defendants were required to disclose this material information as part of the expense ratio. [4]

---

[4] The Court is not persuaded that Securities and Exchange Commission ("SEC") Form N-1A supports the BlackRock Defendants' position.  *See* Mot. at 15 n.12.  Contrary to their suggestion,

United States District Court
Northern District of California

1    The Court accordingly **DENIES** the BlackRock Defendants' motion to dismiss the breach

2    of fiduciary duty claims.

3             ii.    **Prohibited Transactions (Counts II, III)**

4         Plaintiffs' second and third claims allege that BlackRock, BTC, the Retirement

5    Committee, and the Investment Committee Defendants violated ERISA §§ 406(a) and (b), which

6    prohibit party-in-interest and self-dealing transactions. SAC ¶¶ 511–36.  Allegedly, these statutes

7    prohibited the BlackRock Plan's repeated purchase of interests in proprietary funds and payment

8    of securities lending fees from any income.  *Id.*; *see also* Dkt. No. 210-3 ("Opp.") at 26.

9         The BlackRock Defendants posit that Plaintiffs' claims must be dismissed because the

10   transactions fall under the exemptions in ERISA § 408(b)(8), 29 U.S.C. § 1108(b)(8), and Class

11   Exemption 77-3 promulgated by the DOL. Mot. at 13–14.  The BlackRock Defendants concede

12   that their Class Exemption 77-3 argument necessarily depends on extrinsic materials, so it is

13   properly addressed at the summary judgment stage.  *See* Dkt. No. 280 at 5.  ("If the Court

14   concludes that it may not take judicial notice of the share class structure reported in the

15   prospectuses, the same documents require summary judgment on this claim.").  Thus, the Court

16   only considers the § 1108(b)(8) exemption.

17        Section 1108 statutory exemptions are defenses that a defendant has the burden of proving.

18   *See Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *see also Braden*, 588 F.3d at 601.

19   Section 1108 exempts transactions between a plan and CTI maintained by a party-in-interest if the

20   following conditions are satisfied:

21            (A) the transaction is a sale or purchase of an interest in the fund,
              (B) the bank, trust company, or insurance company receives not
22            more than reasonable compensation, and
              (c) such transaction is expressly permitted by the instrument under
23            which the plan is maintained, or by a fiduciary (other than the bank,

24   _____

25   the Form N-1A does not expressly exempt securities lending fees from "other expenses" in Item 3.
     *See* United States Securities and Exchange Commission, Form N-1A,
26   https://www.sec.gov/files/formn-1a.pdf ("Form N-1A").  Item 19 of the Form N-1A requires
     disclosure of "[a]ll fees and/or compensation for each of the following securities lending activities
27   and related services: [a]ny share of revenue generated by the securities lending program paid to
     the securities lending agent(s) ...."  Form N-1A.  The Court finds that this provision is not
28   inconsistent with Plaintiffs' allegation that disclosure of the securities compensation fees was
     required.

United States District Court
Northern District of California

1    trust company, or insurance company, or an affiliate thereof) who
     has authority to manage and control the assets of the plan.

2    29 U.S.C. § 1108(b)(8).  According to Defendants, Plaintiffs cannot "plausibly question" whether

3    the securities lending fees were "more than reasonable compensation" because "innumerable other

4    401(k) plans" invest in CTIs with higher fees.  Mot. at 13–14.  But the burden is not on Plaintiffs

5    to prove at this stage that the fees were unreasonable, and that ends the inquiry on a motion to

6    dismiss.  *See Braden*, 588 F.3d at 602 ("It would be perverse to require plaintiffs bringing

7    prohibited transaction claims to plead facts that remain in the sole control of the parties who stand

8    accused of wrongdoing.").  Defendants do not point to any concession in the SAC that other

9    401(k) plans have higher fees.  To the contrary, the SAC alleges the exact opposite:  that there are

10   lending fees as low as 5% in the market and that many sponsors pay less than 50% in securities

11   lending fees.  SAC ¶¶ 358–67.  Because the BlackRock Defendants have not shown that any of

12   these exemptions apply as a matter of law so as to require dismissal, the Court **DENIES** the

13   BlackRock Defendants' motion to dismiss the prohibited transactions claims.[5]

14              **iii.  Derivative Claims (Counts VI, VII)**

15            In Counts VI and VII, Plaintiffs allege that all the BlackRock Defendants failed to monitor

16   the other fiduciaries and were knowing participants in the alleged misconduct, making them liable

17   as co-fiduciaries.  SAC ¶¶ 557–76.  Defendants argue that these claims must be dismissed because

18   they derive "entirely from the underlying breaches alleged by [P]laintiffs, and must be dismissed

19   with those claims."  Mot. at 15.  Because the Court finds that Plaintiffs have adequately alleged

20   the underlying breaches, the Court **DENIES** the BlackRock Defendants' motion to dismiss the

21   monitoring and co-fiduciary derivative claims.

22         **C.  CTI Class Claims Against BlackRock and BTC (Counts VIII, IX, X)**

23            For the CTI Class claims, Plaintiffs allege that BTC breached its duties by allegedly

24   appointing itself as the lending agent for the CTIs.  *Id*. ¶¶ 323, 343, 586–87.  Plaintiffs also allege

25   _____

26   [5] The BlackRock Defendants have reserved their statute of limitations argument for summary
     judgment in light of the Ninth Circuit's recent decision in *Sulyma v. Intel Corp. Inv. Policy Comm.*

27   holding that under 29 U.S.C. § 1113, a defendant must show plaintiff was "actually aware of the
     nature of the alleged breach more than three years before the plaintiff's action is filed."  909 F.3d

28   1069, 1075 (9th Cir. 2018), *cert. granted*, No. 18-1116, 2019 WL 936242 (U.S. June 10, 2019);
     *see* Reply at 7 n.4.

United States District Court
Northern District of California

that both BTC and BlackRock breached their duties and engaged in prohibited transactions when BlackRock and BTC used Plan assets to pay BTC excessively high compensation. *Id.* ¶¶ 329, 357–360, 586–87, 593–603. And BlackRock and BTC allegedly used CTI cash collateral to invest in overly risky STIFs, another breach of their fiduciary duties. *Id.* ¶¶ 411–19, 586–87.

### i.   Breach of Fiduciary Duties (Count VIII)

Plaintiffs allege that BTC is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) to participants and beneficiaries of all employee benefit plans that indirectly or directly invest in the BTC-sponsored CTIs. *Id.* ¶¶ 315–16. Under § 1002(21)(A)(i), a party that is not a named fiduciary in the plan becomes a "functional" fiduciary if the party "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i); *see Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 837 (9th Cir. 2018).

"The Supreme Court has stressed that the central inquiry is whether the party was acting as an ERISA fiduciary 'when taking the action subject to complaint.'" *Santomenno*, 883 F.3d at 838 (citing *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)). This requires the Court to assess whether BTC was a fiduciary with respect to each specific action alleged in the SAC. The BlackRock Defendants argue that BTC was not a fiduciary when it negotiated its agreed-upon securities lending fees, thereby foreclosing Plaintiffs' claim that BTC breached its duties when receiving that compensation. Mot. at 16–18. The BlackRock Defendants do not, however, dispute that BTC was a functional fiduciary when it made investment decisions with the Plan's assets. *Id.* at 21–25. Instead, the BlackRock Defendants argue that Plaintiffs are time-barred from bringing those investment-related claims. *Id.*

### 1.   Negotiation of Fees and Appointment of BTC as Lending Agent

BTC argues that under the Ninth Circuit's decision in *Santomenno*, it cannot be a fiduciary when negotiating its appointment and compensation as the securities lending agent. Mot. at 16–18 (citing *Santomenno*, 883 F.3d at 838). In *Santomenno*, the Ninth Circuit held that "a service provider owes no fiduciary duty with respect to the negotiation of its fee compensation." *Santomenno*, 883 F.3d at 838. Because the determination of fees happened *before* the actual

United States District Court
Northern District of California

administration of the Plan, the Ninth Circuit held that the service provider, at the time of negotiation, "plainly did not exercise discretionary control over the plan, possess authority over its assets, render investment advice, nor have any discretionary authority in the administration of the plan." *Id.* The Ninth Circuit reasoned that because it was ultimately up to the plan sponsor to decide whether to accept or reject the service provider's services and fees, the plan sponsor would bear responsibility for accepting an arguably excessive fee arrangement. *See id.* ("[n]othing prevented the trustees from rejecting [the provider's] product and selecting another service provider; the choice was theirs." (citation and quotations omitted and alterations in original)). Any other outcome "would lead to absurd results," for if a service provider was a fiduciary when negotiating, it would "have to promise that its fees were no higher than those of any competitor, rather than negotiate at arm's length with an employer." *Id.* BTC is thus correct that it was not a fiduciary when it negotiated its appointment and compensation. *See* Mot. at 16–18.

But whether BTC was a fiduciary and breached its duties when it collected its compensation, alleged to have been 50% "of all securities lending income generated from the BlackRock CTIs' assets," is a distinct inquiry. *See* SAC ¶ 357. The Ninth Circuit has held there is no breach when a service provider collects fees paid out of plan funds in accordance with "definitively calculable and nondiscretionary compensation [ ] clearly set forth in a contract." *Santomenno*, 883 F.3d at 841; *see also Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610, 619 (6th Cir. 2003) ("where parties enter into a contract term at arm's length and where the term confers on one party the unilateral right to retain funds as compensation for services rendered with respect to an ERISA plan, that party's adherence to the term does not give rise to ERISA fiduciary status unless the term authorizes the party to exercise discretion with respect to that right"). Plaintiffs allege that BTC acted as a fiduciary in this regard, because it had discretionary control over disposition of its fees, which purportedly came from the Plan assets in the BTC-sponsored CTIs. SAC ¶¶ 324–29; *see also Santomenno*, 883 F.3d at 839 ("Any control over disposition of plan money makes the person who has the control a fiduciary." (quotations and citation omitted)).

To dispute this factual allegation, the BlackRock Defendants ask the Court to look to the

United States District Court
Northern District of California

1    *16 Things* document to find that the "contract documents make clear that BTC would have been in

2    *breach* had it ceded management of cash collateral to a third-party," and that the fees are

3    "calculated according to a definite, non-discretionary formula."  Mot. at 16–18; Reply at 9–10.

4    But at the motion to dismiss stage, the Court does not consider extrinsic evidence to dispute the

5    allegations in the SAC.  It is not clear from the few documents the Court has found properly

6    incorporated by reference whether BTC's compensation terms were calculated pursuant to a non-

7    discretionary formula as the BlackRock Defendants allege.  *See, e.g.*, Dkt. No. 181-5, Ex. I

8    (Section 9.2 of the CTI Plan stating: "The Trustee [BTC] may charge a reasonable fee . . . for its

9    lending of the Collective Fund's securities . . . and may withdraw the amount thereof from such

10   Collective Fund for its own use and benefit provided that (i) the fee is permitted under applicable

11   law, and (ii) the amount of the fee does not exceed an amount commensurate with the value of

12   legitimate services of tangible benefits to the Participating Accounts …").  Because Plaintiffs

13   sufficiently allege that BTC had control and discretion in setting its compensation, and that such

14   compensation came out of the Plan's funds, the Court **DENIES** the BlackRock Defendants'

15   motion to dismiss with respect to this claim.

16                          **2.   Mismanagement of STIFs**

17          Plaintiffs allege that BTC directed cash collateral from the CTIs into "BTC's most

18   expensive and high risk 'Synthetic STIFs,'" purportedly exposing investors to more risk than was

19   prudent and permitted by the CTI Plan and STIF Guidelines. SAC ¶ 411; *see also id.* ¶ 586.  The

20   two allegedly high risk STIFs were the Cash Equivalent Fund II ("CEF II") and Cash Equivalent

21   Fund B ("CEF B"), which BTC "sponsors, manages, and serves as trustee for." *Id.* ¶¶ 411, 418.

22   As pleaded, they were high risk because of BTC's decision to invest the two STIFs in "debt

23   obligations that paid high interest rates," which were "imprudent investments for a money market

24   fund whose goal is to preserve principal." *Id.* ¶ 420.  CEF II and CEF B held cash collateral in

25   long-term debt obligations backed by subprime home equity loans and other high-risk debt.  *Id.*

26   ¶ 432–34.  Investing the STIFs in these higher risk debt obligations allegedly yields higher interest

27   income, which is beneficial to BTC, but exposes investors to a higher risk of loss of principal.  *Id.*

28   ¶¶ 413–20.  According to Plaintiffs, BTC's portfolio management of the STIFs constituted a

1    breach of its fiduciary duty to loyally "monitor the investments" of CEF II and CEF B.  *Id.*

2    ¶¶ 418–40, 586.  The SAC also alleges that the two STIFs suffered millions of dollars of losses,

3    which Defendants allegedly concealed by withholding income from other investments to offset the

4    losses.  *Id.* ¶¶ 436–63.

5        The BlackRock Defendants argue that claims based on BTC's investment decisions for the

6    STIFs are time-barred by 29 U.S.C. § 1113, as those decisions occurred more than six years prior

7    to the filing of the original Complaint.  Mot. at 21–23.  Alternatively, the BlackRock Defendants

8    argue that Plaintiffs fail to state a claim upon which relief can be granted.  *Id.* at 23–25.

9                                **a.   Time Bar**

10       Under § 1113, a plaintiff may not bring suit more than three years after the date on which

11   she acquires actual knowledge of the alleged breach, or more than six years after the date of the

12   breach or violation, whichever is earlier.  *See* 29 U.S.C. § 1113; *see also Landwehr v. DuPree*, 72

13   F.3d 726, 733 (9th Cir. 1995) ("This six-year outer limit on most ERISA actions should

14   adequately protect defendants from untimely claims.").  However, where there is fraud or

15   concealment, an action may not be commenced later than six years after the *discovery* of such

16   breach or violation.  29 U.S.C. § 1113.

17       Plaintiffs do not dispute that BTC's decisions to invest the STIFs in allegedly risky

18   securities occurred more than six years before the suit was filed, but argue that because BTC had

19   the STIFs *hold* those securities until 2012, the six-year limitation period did not start to run until

20   then.  Opp. at 43; *see* SAC ¶ 439.  Plaintiffs also argue in the alternative that § 1113(1) does not

21   apply because the purportedly wrongful conduct was concealing the losses by withholding income

22   earned from other investments and offsetting the losses against that income.  Opp. at 40.  Under

23   this theory, Plaintiffs contend that the statute only began to run when they discovered the

24   fraudulent concealment, which was not until 2017.  *Id.*

25       The Court agrees that the claims are not time-barred under § 1113(1).  As discussed earlier,

26   the Supreme Court has held that there is a continuing duty to "'systematic[ally] conside[r] all the

27   investments of the trust at regular intervals' to ensure they are appropriate."  *Tibble II*, 135 S. Ct.

28   at 1828 (alterations in original).  So long as "the alleged breach of the continuing duty [to monitor

United States District Court
Northern District of California

23

1   investments and remove imprudent ones] occurred within six years of suit, the claim is timely."

2   *Id*.  Because the alleged wrongful conduct here was a breach of BTC's duty to continuously

3   monitor these STIFs, the date of the violation is not the date when BTC invested the STIFs in the

4   securities, but rather the date when BTC sold those securities in 2012, since the failure to remove

5   these securities continued until then.  *See* Opp. at 43–44; SAC ¶ 439 ("In 2012, many of these

6   [risky securities] held by CEF II and CEF B were sold").  The claims therefore are not time-barred

7   under § 1113(1).[6]

### b.  Failure to State a Claim

9        The Court next considers whether Plaintiffs have sufficiently pled that BTC and

10  BlackRock violated their fiduciary duties by (1) failing to monitor the investments BTC made for

11  the two STIFs (CEF II and CEF B); and (2) improperly concealing losses in the STIFs.

12       The SAC sufficiently pleads that the continuing investments BTC caused the STIFs to

13  make were imprudent and contrary to STIF Guidelines.  According to the SAC, in 2011 and 2012

14  the CTI Plan (Ex. I) and the STIF Guidelines (Ex. K) governed BTC-managed STIFs, including

15  CEF II and CEF B.[7]  SAC ¶ 424.  Section 2.1 of the CTI Plan permits BTC to consider the terms

16  set forth in the STIF Guidelines so long as they are not inconsistent with the CTI Plan.  SAC ¶ 424

17  n.14.  The security instruments BTC invested the STIFs in allegedly did not comply with the STIF

18  Guidelines because they were "long-term debt obligations" as opposed to "short-term debt

19  obligations."  *Id*. ¶¶ 422, 429.  The SAC also points to two specifications in the STIF Guidelines

20  that the CEF II and CEF B portfolio investments failed to meet:  a dollar-weighted average

21  portfolio maturity constraint of 90 days or less to limit interest rate risk, and a maximum expected

22  maturity of three years for a security in the fund to ensure diversification and limit credit risk.  *Id*.

23  ¶ 427; *see also* Dkt. No. 181-6, Ex. K at BAIRD_0071398–399, 406–407.  Under BTC's

24  management, CEF II and CEF B allegedly invested in long-term debt obligations with maturities

25  longer than permitted, and these long-term obligations purportedly caused the dollar-weighted

26

27  [6] For this reason, the Court need not consider the fraudulent concealment theory in assessing timeliness.

28  [7] As discussed in Section II(B), *supra*, all parties agree that the Court may consider BlackRock Exhibits I, J, and K.

United States District Court
Northern District of California

average maturity of the two STIFs to reach approximately "10 times what was permitted."  SAC ¶¶ 427–38.

    While something of a close call, considering the allegations in the light most favorable to Plaintiffs as it must at the motion to dismiss stage, the Court cannot find that the claim fails as a matter of law.  The "Guidelines Criteria" section of the STIF Guidelines states that "in the event that a STIF exceeds a *diversification* limitation," such as the maximum expected maturity requirement, "the STIF may, but is not required to, dispose of portfolio holdings to be within the applicable guideline."  Dkt. No. 181-6, Ex. K at BAIRD_0071399 (emphasis added).[8]  Therefore, that BTC caused the STIFs to invest in instruments with an expected maturity longer than three years does not necessarily mean that BTC did not conform to the STIF Guidelines.  *See id*. However, as to the weighted average maturity restriction, which is meant to limit interest rate exposure, *see* Dkt. No. 181-6, Ex. K at BAIRD_0071398, there is no analogous exception should the investments exceed the dollar-weighted average condition.  The BlackRock Defendants argue that Plaintiffs' average weighted maturity values alleged in the SAC are based on actual maturity dates, when the correct basis is the next interest reset date.  Mot. at 24.  But the Court does not find that reading mandated by the face of the SAC or the STIF Guidelines.  Accordingly, because the SAC alleges that BTC made investment decisions for the two STIFs in a manner contrary to the STIF Guidelines, Plaintiffs sufficiently allege that BTC breached its fiduciary duty by failing to monitor.  *See In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.,* 842 F. Supp. 2d 614, 646 (S.D.N.Y. 2012) (finding that a fiduciary that invests in risky securities and accept risks "significantly beyond those of 'an enterprise of a like character and with like aims'" acts imprudently (citations omitted)).

    With respect to the fraudulent concealment claim, the Court finds that Plaintiffs have not sufficiently alleged that BTC fraudulently concealed the losses.  Plaintiffs' own allegations

---

[8] Plaintiffs argue that the BlackRock Defendants rely "on an older version of the STIF Guidelines (not once mentioned in the Complaint), which [they] assert[] lacked the three-year maturity restriction," and claim that "BlackRock does not attach this version of the STIF Guidelines."  Opp. at 43.  But Defendants cite Exhibit K for the quoted language, which Plaintiffs agree is the 2011-2012 STIF Guidelines incorporated by reference.  Dkt. No. 211-3 at 13; Dkt. No. 283-3 at 1.

United States District Court
Northern District of California

United States District Court
Northern District of California

establish that the audited financial statements for the two funds disclosed that BTC withheld investment income to offset the STIF losses.  SAC ¶¶ 441–46.  Plaintiffs cannot then allege that Defendants concealed this methodology, as the SAC acknowledges that it was disclosed.  *See id*. Further, there are no allegations that Defendants misrepresented the significance of offsetting the losses against withheld income.

The Court thus **GRANTS** the BlackRock Defendants' motion to dismiss the breach of fiduciary duty claim premised on fraudulent concealment of the losses in CEF II and CEF B, but **DENIES** the motion to dismiss with respect to the failure to monitor the STIFs.

### ii.  Prohibited Transactions (Count IX)

Similar to the allegations discussed earlier, the SAC alleges that BTC engaged in prohibited transactions under ERISA § 406(b)(1) when it awarded itself excessive compensation fees.  Because the BlackRock Defendants' Class Exemption 2006-16 argument, Mot. at 18–20, depends on extrinsic evidence to conclude that the securities lending compensation was "reasonable," the Court **DENIES** the BlackRock Defendants' motion to dismiss for similar reasons as discussed in Section III(B)(ii), *supra*.

### iii.  Co-Fiduciary Liability (Count X)

The BlackRock Defendants argue that because BTC is not a fiduciary when negotiating client agreements, it cannot be a co-fiduciary.  Mot. at 18.  The Court finds that Plaintiffs have pled that BTC is a fiduciary when collecting its fees, which are allegedly discretionary and come from the Plan's assets, *see* Section III(C)(i)(1), *supra*, and thus **DENIES** the motion to dismiss the derivative co-fiduciary claim.

### D.  BlackRock Class Claims Against Mercer (Counts IV, VII)

The SAC alleges that Mercer breached its fiduciary duties by failing to provide independent and prudent advice, and engaged in prohibited transactions when it received fees for its "own personal account" from the BlackRock Plan.  SAC ¶¶ 537–48.  Plaintiffs also attempt to hold Mercer liable under a co-fiduciary theory of liability.  *Id*. ¶¶ 574–76.

### i.  Breach of Mercer's Fiduciary Duties (Count IV)

Mercer does not argue that it was not a fiduciary of the Plan, but instead spends the bulk of

United States District Court
Northern District of California

1    its motion arguing that the claims against Mercer fail for the same reasons articulated in the

2    BlackRock Defendants' motion.  *See* Mercer Mot. at 10–16.  It also independently argues that

3    Plaintiffs' "scheme" allegations do not state a plausible claim because they are conclusory, and

4    that Plaintiffs fail to allege that Mercer caused any loss to the Plan.  *Id*. at 17–21.

5           Under 29 U.S.C. § 1109, a fiduciary is liable for a breach of fiduciary duty "only to the

6    extent that losses to the plan result from the breach."  *Friend v. Sanwa Bank California*, 35 F.3d

7    466, 469 (9th Cir. 1994) (citing 29 U.S.C. § 1109).  Mercer argues that Plaintiffs' own allegations

8    establish that its purportedly imprudent and biased advice had no influence on the Investment

9    Committee's decision-making and therefore could not have caused any loss to the Plan.  Mercer

10   Mot. at 20–21.  The Court agrees.  Plaintiffs do not allege that the Investment Committee would

11   have selected different funds if Mercer had given it alternative advice.  Nor could Plaintiffs, as the

12   SAC states the opposite:  the Investment Committee would have selected proprietary funds

13   regardless of Mercer's advice.  Plaintiffs allege that the Investment Committee at times selected

14   the Plan's investment options without seeking any advice from Mercer, including when it chose

15   the LifePath funds, SAC ¶¶ 154–55; the Investment Committee would only follow Mercer's

16   recommendations "after communicating to Mercer the direction in which the Investment

17   Committee wished to go," *id*. ¶¶ 140–42; and the Investment Committee was aware that Mercer

18   allegedly provided advice that was particularly favorable to BlackRock proprietary funds and

19   continued to engage Mercer for that very reason, *id*. ¶¶ 147–59.  Thus, there is no causal

20   connection between Mercer's purported rubber stamping of the Investment Committee's decision

21   and the losses alleged, because it was already predetermined, according to the SAC, what the

22   Investment Committee would do.  As alleged, Mercer's advice was not a "but for" cause of any

23   loss.  *See Sanwa Bank*, 35 F.3d at 469.  Accordingly, Plaintiffs' breach of fiduciary duty claims

24   against Mercer are **DISMISSED**.

25                      **ii.   Mercer's Prohibited Transactions (Count IV)**

26          Plaintiffs' allegations that Mercer engaged in prohibited transactions under ERISA

27   § 502(a)(2) are similar to the CTI Class claims against BTC (Count VIII):  that Mercer, as a

28   service provider, received consideration from assets in the BlackRock Plan.  Unlike the allegations

                                                    27

1   against BTC however, there are no allegations that Mercer had any control and discretion over its

2   fees.  Therefore, Mercer's collection of its fees does not give rise to fiduciary liability under

3   ERISA.  *See Santomenno*, 883 F.3d at 840 ("[a] service provider cannot be held liable for merely

4   accepting previously bargained-for fixed compensation that was not prohibited at the time of the

5   bargain." (citation and quotations omitted and alterations in original)); *see also* Section

6   III(C)(i)(1), *supra*.  The Court **GRANTS** Mercer's motion to dismiss Plaintiffs' prohibited

7   transaction claim.

8                       **iii.   Co-Fiduciary Liability (Count VII)**

9           Unlike the claims against the BlackRock Defendants, Plaintiffs do not adequately plead

10   that Mercer committed an underlying breach, and therefore Mercer cannot be liable as a co-

11   fiduciary under 29 U.S.C. § 1105(a)(2).  However, Mercer may still be liable for the BlackRock

12   Defendants' breach if Mercer knowingly participated in or concealed "an act or omission of such

13   other fiduciary, knowing such act or omission is a breach," or if Mercer knew of a breach and did

14   not make reasonable efforts to remedy it.  29 U.S.C. §§ 1105(a)(1) and (3).

15           As discussed above, Plaintiffs have adequately alleged a predicate breach by the

16   BlackRock Defendants.  *See* Sections III(B) and (C), *supra*.  The question now is whether Mercer

17   *knowingly* participated in or failed to remedy the purported breach.  Plaintiffs argue that Mercer

18   knew BlackRock favored proprietary funds for inclusion in the Plan.  Opp. at 31 (citing SAC

19   ¶ 574).  That the BlackRock Defendants preferred proprietary funds does not give rise to a breach

20   of fiduciary duty.  *See* Section III(B)(i)(1), *supra*.  Plaintiffs do not allege that Mercer had

21   knowledge of any of the other alleged facts that the Court found were collectively sufficient to

22   allege a breach.  *See id*.  Therefore, Plaintiffs fail to plead a co-fiduciary liability claim against

23   Mercer and the Court **DISMISSES** this claim.

24                       **iv.   Leave to Amend**

25           The Ninth Circuit has held that a court need not grant leave to amend "where the

26   amendment of the complaint would cause the opposing party undue prejudice, is sought in bad

27   faith, constitutes an exercise in futility, or creates undue delay."  *Janicki Logging Co. v. Mateer*,

28   42 F.3d 561, 566 (9th Cir. 1994) (quotations and citation omitted).  An amendment would be futile

1    if a court "determines that the pleading could not possibly be cured by the allegation of other

2    facts." *Lopez*, 203 F.3d at 1127 (citation omitted); *see also Schmier v. U.S. Court of Appeals for*

3    *Ninth Circuit*, 279 F.3d 817, 824 (9th Cir. 2002) ("[I]t was not factually possible for [plaintiff] to

4    amend the complaint … ." (quotations and citations omitted)).

5         The Court finds that Plaintiffs cannot amend their complaint to allege claims against

6    Mercer based on the claims already alleged in the SAC.  When Plaintiffs moved to file their SAC

7    and add Mercer as a defendant, Plaintiffs argued that adding Mercer was "far from futile" because

8    Plaintiffs seek certain relief that is "only available against Mercer (*i.e.*, the disgorgement of the ill-

9    gotten fees Mercer received for its imprudent and disloyal advice)."  Dkt. No. 133-3 at 12.  But the

10   Court finds that Plaintiffs' pleadings confirm that they cannot state a claim against Mercer for its

11   "imprudent and disloyal advice."  *See id*.  For Plaintiffs to plausibly plead a claim against Mercer

12   for breach of fiduciary duties, they must allege a causal link between Mercer's alleged misconduct

13   (*i.e.* the allegedly imprudent and disloyal advice) and Plaintiffs' losses.  *See* 29 U.S.C. § 1109; *see*

14   *also Sanwa Bank*, 35 F.3d at 469.  Plaintiffs would have to claim that Mercer's allegedly improper

15   advice influenced the Investment Committee to select those proprietary funds.  But their

16   allegations already foreclose this possibility:  according to Plaintiffs, it was already predetermined

17   that the Investment Committee would select BlackRock proprietary funds, regardless of Mercer's

18   advice.  *See, e.g.* SAC ¶¶ 140–59.  Plaintiffs thus cannot amend their complaint to sufficiently

19   plead allegations to show that Mercer caused any loss in a manner that would be consistent with

20   the allegations already made in the SAC.  Amendment in this case would be futile.  *See Sprewell*

21   *v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d

22   1187 (9th Cir. 2001) ("A plaintiff can plead himself out of court by alleging facts which show that

23   he has no claim, even though he was not required to allege those facts." (citation and quotations

24   omitted)).

25        Granting leave to amend also would cause undue delay and prejudice in this already long-

26   standing case.  Plaintiff Baird filed his initial complaint against the BlackRock Defendants on

27   April 5, 2017, over two years ago.  Dkt. No. 1.  Plaintiffs have had two chances already to amend

28   their complaint:  once on October 10, 2017, Dkt. No. 75, and again almost a year later on August

United States District Court
Northern District of California

27, 2018, Dkt. No. 154.  Importantly, fact discovery closed on March 6, 2019 and expert discovery

closed on May 8, 2019.  Dkt. No. 251.  To the extent Plaintiffs discovered any additional facts to

bolster their claims against Mercer, Plaintiffs could have sought leave to amend then.  At this

point, the parties have completed their class certification briefing.  Granting Plaintiffs leave to

amend again at this stage would unreasonably delay the efficient conclusion of these proceedings,

given the above-described defects in Plaintiffs' theory.

Accordingly, the Court finds that leave to amend is not warranted, and **GRANTS** Mercer's

motion to dismiss **WITHOUT LEAVE TO AMEND**.[9]

## IV.    ADMINISTRATIVE MOTIONS TO SEAL

The parties also filed administrative motions to seal portions of several documents filed by

Defendants and Plaintiffs.  Dkt. Nos. 177, 180, 210, 211, 224, 225, 283.

### A.  Legal Standard

For motions to seal that comply with the local rules, courts generally apply a "compelling

reasons" standard.  *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 677–78 (9th Cir. 2010).  "This

standard derives from the common law right 'to inspect and copy public records and documents,

including judicial records and documents.'"  *Id*. (quoting *Kamakana v. City & Cty. of Honolulu*,

447 F.3d 1172, 1178 (9th Cir. 2006)).  "Unless a particular court record is one traditionally kept

secret, a strong presumption in favor of access is the starting point."  *Kamakana*, 447 F.3d at 1178

(quotation marks and citation omitted).  To overcome this strong presumption, the moving party

must "articulate compelling reasons supported by specific factual findings that outweigh the

general history of access and the public policies favoring disclosure, such as the public interest in

understanding the judicial process."  *Id*. at 1178–79 (citations, quotation marks, and alterations

omitted).  "In general, compelling reasons sufficient to outweigh the public's interest in disclosure

and justify sealing court records exist when such court files might have become a vehicle for

improper purposes, such as the use of records to gratify private spite, promote public scandal,

_____

[9] For similar reasons, the Court denies leave to amend the fraudulent concealment claim (which is part of Count VIII).

United States District Court
Northern District of California

1    circulate libelous statements, or release trade secrets." *Id.* at 1179 (quotation marks and citation

2    omitted).  The Court must:

3              balance the competing interests of the public and the party who seeks
               to keep certain judicial records secret.   After considering these
4              interests, if the Court decides to seal certain judicial records, it must
               base its decision on a compelling reason and articulate the factual
5              basis for its ruling, without relying on hypothesis or conjecture.

6    *Id.* (citations, brackets, and quotation marks omitted).

7         Civil Local Rule 79-5 supplements the "compelling reasons" standard.  The party seeking

8    to file under seal must submit "a request that establishes that the document, or portions thereof, are

9    privileged, protectable as a trade secret or otherwise entitled to protection under the law . . . .  The

10   request must be narrowly tailored to seek sealing only of sealable material . . . ."  Civil L.R. 79-

11   5(b).  Courts have found that "confidential business information" in the form of "license

12   agreements, financial terms, details of confidential licensing negotiations, and business strategies"

13   satisfies the "compelling reasons" standard.  *See In re Qualcomm Litig.*, No. 3:17-cv-0108-GPC-

14   MDD, 2017 WL 5176922, at *2 (S.D. Cal. Nov. 8, 2017) (observing that sealing such information

15   "prevent[ed] competitors from gaining insight into the parties' business model and strategy");

16   *Finisar Corp. v. Nistica, Inc.*, No. 13-cv-03345-BLF (JSC), 2015 WL 3988132, at *5 (N.D. Cal.

17   June 30, 2015).

18        Finally, records attached to motions that are only "tangentially related to the merits of a

19   case" are not subject to the strong presumption of access.  *Ctr. for Auto Safety v. Chrysler Grp.,*

20   *LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016).  Accordingly, parties moving to seal such records need

21   only meet the lower "good cause" standard of Rule 26(c).  *Id.* at 1097.  The "good cause" standard

22   requires a "particularized showing" that "specific prejudice or harm will result" if the information

23   is disclosed.  *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th

24   Cir. 2002) (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 26(c).

25        **B.  Discussion**

26        The parties seek to seal portions and documents which pertain to Defendants' motions to

27   dismiss, related briefings, and supporting exhibits.  Because these documents are more than

28   tangentially related to the underlying cause of action, the Court applies the "compelling reasons"

United States District Court
Northern District of California

31

standard.

The current sealing requests seek to seal information materially identical to prior sealing requests, which this Court granted.  *See* Dkt. No. 150.  The excerpts parties seek to seal identify and reflect redacted material from Plaintiffs' SAC that the Court previously held was sealable. *See id.* at 2.  The BlackRock Defendants and Plaintiffs also seek to seal their Exhibit I and Exhibit 1, respectively, which are excerpts of the CTI Plan.  Dkt. Nos. 180, 210.  The CTI Plan is not in the public record and contains sensitive information about the governance, administration, and operation of the BlackRock CTIs.  Dkt. No. 180-1 ¶¶ 4–7.  The parties also seek to seal portions of Plaintiffs' response to Defendants' supplemental briefing that reflect deposition testimony and documents referencing the Investment Committee's confidential actions and deliberations, and Mercer's consulting advice.  Dkt. Nos. 283, 285, 286.  The designating parties have submitted supporting declarations establishing that the information contains sensitive and proprietary information, including "sensitive analyses and other information regarding the [Plan], including proprietary third-party analyses."  Dkt. No. 184; *see also* Dkt. Nos. 216, 217, 285, 286.  As the Court previously held, the information contains "confidential business and financial information relating to the operations of BlackRock," constituting a sufficiently compelling reason to seal.  *See* Dkt. No. 150 at 2–3 (citing *Apple Inc. v. Samsung Elecs. Co., Ltd.*, No. 11-CV-01846-LHK, 2012 WL 6115623 (N.D. Cal. Dec. 10, 2012); *Agency Solutions.Com, LLC v. TriZetto Group, Inc.*, 819 F. Supp. 2d 1001, 1017 (E.D. Cal. 2011); *Linex Techs., Inc. v. Hewlett-Packard Co.*, No. C 13-159 CW, 2014 WL 6901744 (N.D. Cal. Dec. 8, 2014)).  The Court sees no reason why it should here find that information it previously deemed sealable no longer meets the "compelling reasons" standard.

The Court accordingly finds that the parties have met the standard to warrant sealing relevant portions of the Defendants' motions to dismiss, related briefings, and supporting exhibits.

## V.   CONCLUSION

The Court **GRANTS IN PART AND DENIES IN PART** the BlackRock Defendants' motion to dismiss, Dkt. No. 181, and dismisses without leave to amend Plaintiffs' Claim VIII to the extent that it is premised on alleged fraudulent concealment of STIFs' losses.  The Court also

**GRANTS** Mercer's motion to dismiss **WITHOUT LEAVE TO AMEND**.  Dkt. No. 178.  The Clerk is directed to terminate Mercer from the case.

The Court **GRANTS** the pending administrative sealing motions.  Dkt. Nos. 177, 180, 210, 211, 224, 225, 283.  Pursuant to Civil Local Rule 79-5(f)(1), documents filed under seal as to which the administrative motions are granted will remain under seal.  The public will have access only to the redacted versions accompanying the administrative motions.

**IT IS SO ORDERED.**

Dated:  9/3/2019

HAYWOOD S. GILLIAM, JR.
United States District Judge